Barry I. Levy, Esq.
Max Gershenoff, Esq.
Qasim I. Haq, Esq.
RIVKIN RADLER LLP
926 RXR Plaza,
Uniondale, NY 11553
(516) 357-3000
max.gershenoff@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General Insurance*
*Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., <br><br> Plaintiffs, <br><br> –against– <br><br> JAMES K. CHANG, M.D., JKC PAIN MGT, LLC, JAMES CHANG, M.D., P.C., DAVID C. ABRAMS, D.C., DENNY A. JULEWICZ, D.C., JOHN P. PIAZZA, D.C., ANTHONY M. PALUMBO, D.C., and DRS. ABRAMS, PIAZZA & JULEWICZ DC, PLLC, <br><br> Defendants. | Docket No.: _____( ) <br><br> **Plaintiffs Demand a Trial by Jury** |

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,640,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent and unlawful no-fault insurance charges through JKC Pain Mgt., LLC ("JKC Pain"), James Chang, M.D., P.C. ("Chang PC"), and Drs. Abrams, Piazza and Julewicz, PLLC ("APJ Chiro") for purported examinations, electrodiagnostic ("EDX") testing, pain management injections, chiropractic, and physical therapy services (collectively the "Fraudulent Services").

2.      The Fraudulent Services were provided, to the extent that they were provided at all, to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of JKC Pain, Chang PC, and APJ Chiro because of the fraudulent and unlawful conduct described herein.

4.      The Defendants fall into the following categories:

(i)     Defendant APJ Chiro is a New York professional limited liability company through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO in New York.

(ii)    Defendant Denny A. Julewicz, D.C. ("Julewicz") is a chiropractor who was licensed to practice chiropractic in New York on or about December 17, 2002, and in New Jersey on or about March 12, 2003. Julewicz owned, controlled, and was a member of APJ Chiro and used it as a vehicle to submit fraudulent and unlawful

2

no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO.

(iii)     Defendant David C. Abrams, D.C. ("Abrams") is a chiropractor who was licensed to practice chiropractic in New York on or about August 13, 1982, and in New Jersey on or about March 10, 1983. Abrams owned, controlled, and was a member of APJ Chiro and used it as a vehicle to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO.

(iv)     Defendant John P. Piazza, D.C. ("Piazza") is a chiropractor who was licensed to practice chiropractic in New York on or about June 28, 1996, and in New Jersey on or about July 10, 2015. Piazza owned, controlled, and was a member of APJ Chiro and used it as a vehicle to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO.

(v)     Defendant Anthony M. Palumbo, D.C. ("Palumbo") is a chiropractor who was licensed to practice chiropractic in New York on or about January 9, 1996, and in New Jersey on or about July 1, 2015. Palumbo was associated with APJ Chiro, purported to conduct many of the Fraudulent Services on behalf of APJ Chiro, and used APJ Chiro as a vehicle to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO.

(vi)     Defendant JKC Pain is a New Jersey medical professional limited liability company through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO in New York and New Jersey.

(vii)     Defendant Chang PC is a New Jersey medical professional corporation through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO in New York and New Jersey.

(viii)     Defendant James K. Chang, M.D., ("Chang") is a physician who was licensed to practice medicine in New York on or about July 29, 2009, and in New Jersey on or about February 18, 2010. Chang owned, controlled, and/or was a member of JKC Pain and Chang PC, and used JKC Pain and Chang PC as vehicles to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO in New York and New Jersey.

5.     As discussed below, the Defendants at all relevant times have known that:

(i)     the Defendants paid and received unlawful compensation in exchange for patient referrals;

(ii)     JKC Pain, Chang PC, and Chang engaged in an unlawful self-referral scheme;

3

(iii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services never were provided in the first instance;

(v)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(vi)    the Fraudulent Services were not provided in compliance with relevant laws and regulations governing health care practice and, as a result, were not eligible for no-fault reimbursement in the first instance.

6.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO. The charts annexed hereto as Exhibits "1" – "3" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the mails.

7.    The Defendants' fraudulent and unlawful scheme began no later than 2017 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,600,000.00.

## THE PARTIES

### I.    Plaintiffs

8.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

II.       **Defendants**

9.     Defendant APJ Chiro is a New York chiropractic professional limited liability company with its principal place of business in New York. APJ Chiro was organized in New York on or about February 23, 2011, was owned and controlled by Abrams, Julewicz, and Piazza, had them as its members, and was used by Abrams, Julewicz, and Piazza as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

10.     Defendant Piazza resides in and is a citizen of New York and was licensed to practice chiropractic in New York on or about June 28, 1996, and in New Jersey on or about July 10, 2015. Piazza owned, controlled, and was a member of APJ Chiro, purported to perform many of the Fraudulent Services at APJ Chiro, and used APJ Chiro as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

11.     Defendant Palumbo resides in and is a citizen of New York and was licensed to practice chiropractic in New York on or about January 09, 1996, and in New Jersey on or about July 1, 2015. Palumbo was associated with APJ Chiro, purported to perform many of the Fraudulent Services at APJ Chiro, and used APJ Chiro as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

12.     Defendant Julewicz resides in and is a citizen of New Jersey and was licensed to practice chiropractic in New York on or about December 17, 2002, and in New Jersey on or about March 12, 2003. Julewicz owned, controlled, and was a member of APJ Chiro, purported to perform many of the Fraudulent Services at APJ Chiro, and used APJ Chiro as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

13.     Defendant Abrams resides in and is a citizen of New Jersey and was licensed to practice chiropractic in New York on or about August 13, 1982 and in New Jersey on or about March 10, 1983. Abrams owned, controlled, and was a member of APJ Chiro, purported to perform

many of the Fraudulent Services at APJ Chiro, and used APJ Chiro as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

14.     Defendant JKC Pain is a New Jersey medical limited liability company with its principal place of business in New Jersey. JKC Pain was organized in New Jersey on or about January 9, 2015, was owned and controlled by Chang, and was used by Chang as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

15.     Defendant Chang PC is a New Jersey medical professional corporation with its principal place of business in New Jersey. Chang PC was incorporated in New Jersey on or about September 16, 2009, was owned and controlled by Chang, and was used by Chang as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

16.     Defendant Chang resides in and is a citizen of New Jersey and was licensed to practice medicine in New York on or about July 29, 2009, and in New Jersey on or about February 18, 2010. Chang owned and controlled JKC Pain and Chang PC, purported to perform many of the Fraudulent Services at JKC Pain and Chang PC, and used JKC Pain and Chang PC as vehicles to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

## III.    Other Pertinent Individuals and Entities

17.     Although it is not named as a defendant in this action, Union Surgery Center, LLC ("Union ASC") is relevant to understanding the Defendants' fraudulent and unlawful scheme and the claims brought in this action.

18.     Union ASC is a New Jersey limited liability company with its principal place of business in New Jersey, Union ASC is licensed as a New Jersey ambulatory care facility, and was organized in New Jersey on or about April 19, 2010. Chang was a shareholder in Union ASC, owned an investment interest in Union ASC, controlled Union ASC, and used Union ASC as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

<u>**JURISDICTION AND VENUE**</u>

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

20.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

21.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

23.     For example, the Defendants operated their fraudulent and unlawful health care practices on a regular and consistent basis in New York, and submitted or caused to be submitted a large amount of fraudulent and unlawful billing to GEICO in New York, under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds, typically in the Eastern District of New York. In reliance on the fraudulent and

unlawful claims, personnel at a GEICO office in the Eastern District of New York issued payment on the claims.

24.    What is more, and as set forth herein, the Defendants transacted and solicited substantial business in New York, derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York, and committed tortious acts that caused injury to GEICO in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

25.    GEICO underwrites automobile insurance in New York and New Jersey.

### A.    Pertinent New York Law Governing No-Fault Insurance Reimbursement

26.    New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

27.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

28.    In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

29.    In New York, an Insured can assign their right to PIP Benefits to health care goods and services providers in exchange for those services.

30.    In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary

services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or by using the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

31.     Pursuant to the New York no-fault insurance laws, health care services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

32.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

33.     Pursuant to the New York Education Law, foreign medical professional entities operating in New York must apply for authority to do business in New York and must have a certificate of authority from the New York Department of Education. <u>See</u>, <u>e.g.</u>, N.Y. Educ. Law §§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530.

34.     Foreign medical professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to receive PIP Benefits.

35.     New York law prohibits licensed health care services providers, including licensed chiropractors and physicians, from paying or accepting compensation in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530; 6531; <u>see also</u> 8 N.Y.C.R.R. §

29.1. Therefore, a health care provider that pays or receives kickbacks or unlawful compensation in exchange for patient referrals is not eligible to receive PIP Benefits.

36.     In addition, New York law prohibits licensed health care services providers, including physicians, from referring patients to health care practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

37.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

38.     When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

39.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a health care services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.      Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

40.      Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B–1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A–1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

41.      As in New York, under the New Jersey no-fault laws, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. Pursuant to such an assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA–1500 form.

42.      In order for a health care services provider to be eligible to receive PIP Benefits under the New Jersey no-fault laws, it must comply with all significant laws and regulations governing health care practice in New Jersey.

43.      Thus, a health care services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing health care practice in New Jersey, whether or not the underlying services were medically necessary or actually provided.

44.      Moreover, in order for a specific health care service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing health care practice in New Jersey.

45.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to health care services providers that are not in compliance with all significant statutory and regulatory requirements governing health care practice in New Jersey.

46.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for health care services that are not rendered in compliance with all significant statutory and regulatory requirements governing health care practice in New Jersey.

47.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

48.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a health care service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the health care service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or examination or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name ….

(Emphasis added).

49.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

50.     In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space or equipment.

(Emphasis added).

51.     Similarly, pursuant to N.J.A.C. 13:44-E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

52.     In keeping with the general proscription against the payment of compensation in exchange for patient referrals (see N.J.A.C. 13:35-6.17; N.J.A.C. 13:44E-2.6), and the specific provisions of N.J.A.C. 13:35-6.17 that are aimed at preventing illegal referral fees from being disguised as ostensibly-legitimate "rent" payments (see N.J.A.C. 13:35-6.17(h)), N.J.A.C. 13:44E-3.9 provides – in pertinent part – that:

> A chiropractic physician requesting that another chiropractic physician or other practitioner perform any diagnostic tests shall … [n]ot refer a patient to another practitioner practicing at the same premises …, unless: … [t]hat other practitioner is a bona fide partner, fellow shareholder of a professional service corporation or other permitted practice structure, or a regularly salaried practitioner-employee of the chiropractic physician requesting the performance of a diagnostic test ….

53.     N.J.A.C. 13:44E-3.1 defines "practitioner" as "a licensee of a professional board authorized to render health care services, including, but not limited to, chiropractic physicians, medical doctors, podiatric physicians, physical therapists and registered professional nurses."

54.     N.J.A.C. 13:44E-3.1 defines "diagnostic test" to include "a professional service utilizing biomechanical, neurological, neurodiagnostic, radiological, vascular or any means, other than bioanalysis, intended to assist in establishing a diagnosis, for the purpose of recommending a course of treatment for the tested patient to be implemented by a chiropractic physician or other treating practitioner."

55.     Thus, pursuant to N.J.A.C. 13:44E-3.9, a chiropractor may not refer a patient to a physician practicing at the same premises as the chiropractor, for any types of professional services other than bioanalysis that are aimed at establishing a diagnosis for use in recommending a course

of treatment to be implemented by a chiropractor, unless the physician actually is the chiropractor's bona fide partner, fellow shareholder in a professional entity, or regularly salaried employee.

56.     Physicians, medical practices, chiropractors, and chiropractic practices that pay or receive unlawful compensation in exchange for patient referrals are not eligible to collect PIP Benefits

57.     In New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a health care practice in which they have a "significant beneficial interest".

58.     Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest ….

59.     Pursuant to N.J.S.A. 45:9–22.4:

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

> "Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

> "Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

60.     Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office ….

61.     Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to referrals for certain procedures performed at an ambulatory care facility, such as an ambulatory surgery center, so long as certain conditions are met (the "ASC Exception").

62.     In particular, and as set forth in N.J.S.A. 45:9-22-5(c)(3), prior to January 2019 the Codey Law's restrictions did not apply to:

> ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:
>
> > (a)     the practitioner who provided the referral personally performs the procedure;
> >
> > (b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;
> >
> > (c)     all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and
> >
> > (d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

63.     After January 2019, the Codey Law's restrictions did not apply to:

> ambulatory surgery or procedures involving the use of any anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:
>
> > (a)     the practitioner who provided the referral personally performs the procedure;

(b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c)     all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

(d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

64.     Thus, if a physician self-referred patients for a medical procedure at an ambulatory care facility, the referrals would not qualify for the ASC Exception and therefore would violate the Codey Law unless – among other things – the physician who made the referral personally performed the resulting procedure, and the procedure actually required (or legitimately involved the use of) anesthesia.

65.     Physicians, medical practices, and ambulatory care facilities in New Jersey that engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

66.     Pursuant to N.J.S.A. 39:6A–4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a health care services provider is only eligible to receive PIP Benefits for medically necessary services.

67.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

68.     When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent

manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee was not excessive.

## II.     The Defendants' Fraudulent Scheme

69.     Beginning no later than 2017, and continuing through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they caused a large amount of fraudulent and unlawful PIP billing to be submitted to GEICO for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

## A.     JKC Pain's Unlawful Operations in New York

70.     As set forth above, JKC Pain is a New Jersey medical professional limited liability company, not a New York medical professional limited liability company.

71.     As set forth above, pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), health care services providers are not eligible to collect PIP Benefits if the providers fail "to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …."

72.     Pursuant to the New York Education Law, medical professional entities operating in New York must have a certificate of authority from the New York Department of Education and must be properly incorporated in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

73.     JKC Pain never obtained a certificate of authority from the New York Education Department and was never properly incorporated in New York.

74.     For instance, searches of the New York Department of State Division of Corporations website indicate that JKC Pain was never incorporated in New York.

75.     Likewise, searches of the New York Education Department's Office of the Professions website indicate that JKC Pain never received any certificate of authority from the Education Department.

76.     Even so, Chang routinely and unlawfully operated JKC Pain as a medical practice in New York.

77.     For example:

(i)      On or about January 17, 2017, Chang and JKC Pain billed GEICO for facet joint injections purportedly provided through JKC Pain to an Insured named BL at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the facet joint injection because it could not lawfully provide the service in New York.

(ii)     On or about March 16, 2017, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named GM at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(iii)    On or about September 15, 2017, Chang and JKC Pain billed GEICO for an EDX test purportedly provided through JKC Pain to an Insured named OH at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the EDX test because it could not lawfully provide the service in New York.

(iv)    On or about April 3, 2018, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named WZ at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(v)     On or about May 15, 2018, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named MP at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(vi)    On or about July 10, 2018, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named MG at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was

ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(vii)     On or about September 11, 2018, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named JS at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(viii)    On or about September 14, 2018, Chang and JKC Pain billed GEICO for an EDX test purportedly provided through JKC Pain to an Insured named YT at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the EDX test because it could not lawfully provide the service in New York.

(ix)      On or about September 25, 2018, Chang and JKC Pain billed GEICO for a pain management injection purportedly provided through JKC Pain to an Insured named SM at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the pain management injection because it could not lawfully provide the service in New York.

(x)       On or about September 25, 2018, Chang and JKC Pain billed GEICO for a pain management injection purportedly provided through JKC Pain to an Insured named JR at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the pain management injection because it could not lawfully provide the service in New York.

(xi)      On or about October 23, 2018, Chang and JKC Pain billed GEICO for trigger point injections purportedly provided through JKC Pain to an Insured named HC at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative trigger point injections because it could not lawfully provide the service in New York.

(xii)     On or about October 23, 2018, Chang and JKC Pain billed GEICO for trigger point injections purportedly provided through JKC Pain to an Insured named PL at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative trigger point injections because it could not lawfully provide the service in New York.

(xiii)    On or about December 4, 2018, Chang and JKC Pain billed GEICO for trigger point injections purportedly provided through JKC Pain to an Insured named JV at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative trigger point injections because it could not lawfully provide the service in New York.

(xiv)    On or about December 4, 2018, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named SA at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(xv)    On or about January 8, 2019, Chang and JKC Pain billed GEICO for trigger point injections purportedly provided through JKC Pain to an Insured named LM at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative trigger point injections because it could not lawfully provide the service in New York.

(xvi)    On or about February 19, 2019, Chang and JKC Pain billed GEICO for trigger point injections purportedly provided through JKC Pain to an Insured named OC at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative trigger point injections because it could not lawfully provide the service in New York.

(xvii)    On or about May 21, 2019, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named JC at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(xviii)    On or about June 4, 2019, Chang and JKC Pain billed GEICO for trigger point injections purportedly provided through JKC Pain to an Insured named AQ at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative trigger point injections because it could not lawfully provide the service in New York.

(xix)    On or about June 4, 2019, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named DG at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(xx)    On or about June 25, 2019, Chang and JKC Pain billed GEICO for an initial examination purportedly provided through JKC Pain to an Insured named OK at 3077 Hylan Blvd, Staten Island, New York, despite the fact that JKC Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

78.    These are only representative examples. All of the claims for Fraudulent Services identified in Exhibit "2" for services that purportedly were provided in New York were provided in

violation of New York law, because JKC Pain lacked the authority to operate as a medical practice in New York.

**B.      The Payment and Receipt of Unlawful Compensation in Exchange for Patient Referrals**

79.      In order to bill GEICO and other automobile insurers for initial examinations, follow up examinations, EDX testing, and pain management injections, JKC Pain, Chang PC, and Chang needed to obtain patient referrals from other health care providers.

80.      Accordingly, JKC Pain, Chang PC, and Chang entered into unlawful arrangements with APJ Chiro, Abrams, Julewicz, Piazza, as well as others, pursuant to which JKC Pain, Chang PC, and Chang would pay unlawful compensation in exchange for the patient referrals.

81.      At the same time APJ Chiro, Abrams, Julewicz, and Piazza wanted to submit as much chiropractic and physical therapy billing as possible to GEICO and other insurers, without regard for whether the underlying chiropractic and physical therapy services were medically necessary.

82.      However, to the extent that the Insureds in the claims set forth in Exhibits "1" – "3" suffered any injuries at all in their automobile accidents, they virtually always were minor soft tissue injuries such as sprains or strains.

83.      Because ordinary soft tissue injuries such as sprains or strains almost always resolve after a short course of conservative treatment, or no treatment at all, APJ Chiro, Abrams, Julewicz, and Piazza knew that their ability to submit and obtain payment on large amounts of chiropractic, physical therapy, and related billing to GEICO and other automobile insurers would be limited, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic and physical therapy services beyond an initial short course of conservative treatment.

84.      APJ Chiro, Abrams, Julewicz, and Piazza also knew that it would be much easier

for them to obtain payment on large amounts of PIP insurance billing for medically unnecessary chiropractic and physical therapy services if a licensed physician or physicians were to generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains.

85.     Accordingly, APJ Chiro, Abrams, Julewicz, and Piazza entered into secret agreements with Chang, JKC Pain, and Chang PC, whereby APJ Chiro, Abrams, Julewicz, and Piazza would refer Insureds to Chang, JKC Pain, and Chang PC for expensive and medically unnecessary examinations, EDX testing, and/or pain management injections despite the Insureds' total lack of any genuine presenting problems that would warrant the examinations, EDX testing, or pain management injections.

86.     In exchange for the medically unnecessary referrals, Chang, JKC Pain, and Chang PC paid unlawful compensation to APJ Chiro, Abrams, Julewicz, and Piazza.

87.     The unlawful compensation was provided in the form of: (i) ostensibly legitimate payments to "lease" space at APJ Chiro, Abrams, Julewicz, and Piazza's offices in Staten Island, New York, which actually were disguised compensation paid in exchange for patient referrals; and/or (ii) return referrals back from Chang, JKC Pain, and Chang PC to APJ Chiro for the continued provision of medically unnecessary chiropractic and physical therapy services.

88.     In reality, these were "pay–to–play" arrangements that caused APJ Chiro, Abrams, Julewicz, and Piazza to provide access to Insureds and to refer Insureds to Chang, JKC Pain, and Chang PC for medically unnecessary examinations, EDX testing, and pain-management injections.

89.     In keeping with the fact that their ostensibly legitimate "rent" payments to APJ Chiro, Abrams, Julewicz, and Piazza actually were disguised compensation in exchange for patient

referrals, Chang, JKC Pain, and Chang PC operated from APJ Chiro's offices in Staten Island on an occasional and sporadic basis.

90.     For example, Chang, JKC Pain, and Chang PC did not maintain regular office hours at APJ Chiro's office. Rather, they appeared at APJ Chiro's office sporadically, on different days each month, only when APJ Chiro, Abrams, Julewicz, and Piazza had patients to refer to Chang, JKC Pain, and Chang PC pursuant to the Defendants' unlawful referral scheme.

91.     In keeping with the fact that Chang, JKC Pain, and Chang PC did not maintain regular office hours at the office of APJ Chiro, when Chang, JKC Pain, and Chang PC would operate from APJ Chiro's Staten Island offices, the only patients they saw at the offices were patients who were referred to them by the APJ Chiro Defendants.

92.     In addition to the phony "lease" payments, Chang, JKC Pain, and Chang PC's false contentions that Insureds continued to suffer from significant levels of pain, functional deficits, and radiculopathies as the result of their minor automobile accidents, and return referrals of the Insureds back to APJ Chiro for the continued provision of medically unnecessary chiropractic and physical therapy services, constituted unlawful compensation to APJ Chiro, Abrams, Julewicz, and Piazza for their initial referrals of Insureds to Chang, JKC Pain, and Chang PC, as these contentions, diagnoses, and referrals provided a false justification for APJ Chiro to continue to provide medically unnecessary chiropractic and physical therapy services to the Insureds.

93.     In keeping with the fact that Chang, JKC Pain, and Chang PC's return referrals to APJ Chiro were not predicated on medical necessity, and in fact constituted unlawful compensation to APJ Chiro, Abrams, Julewicz, and Piazza for the initial referrals of the Insureds, Chang, JKC Pain, Chang PC, and APJ Chiro's own records indicated that the prior chiropractic and physical therapy services the Insureds already had received had not been effective in resolving

the Insureds' supposed complaints.

94.   For example:

(i)   On January 13, 2016, an Insured named BL was involved in an automobile accident. Thereafter, BL sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided BL with chiropractic treatment between January 2016 and February 2017. In February 2017, Abrams, Piazza, Julewicz, and APJ Chiro caused BL to be referred to JKC Pain in exchange for unlawful compensation that Chang and JKC Pain provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on February 2, 2017, Chang purported to examine BL on behalf of JKC Pain. In the February 2, 2017, examination report, Chang falsely contended that BL continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – BL had received over one year of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving BL's putative symptoms, Chang nonetheless referred BL back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the February 2, 2017, examination – over one year after the accident, and long after any legitimate symptoms BL may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to JKC Pain.

(ii)   On July 18, 2016, an Insured named JM was involved in an automobile accident. Thereafter, JM sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided JM with chiropractic treatment between September 2016 and April 2018. In April 2018, Abrams, Piazza, Julewicz, and APJ Chiro caused JM to be referred to JKC Pain in exchange for unlawful compensation that Chang and JKC Pain provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on April 3, 2018, Chang purported to examine JM on behalf of JKC Pain. In the April 3, 2018, examination report, Chang falsely contended that JM continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – JM had received over nineteen months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving JM's putative symptoms, Chang nonetheless referred JM back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the April 3, 2018, examination – over nineteen months after the accident, and long after any legitimate symptoms JM may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to JKC Pain.

(iii)   On August 28, 2017, an Insured named AC was involved in an automobile accident. Thereafter, AC sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz,

who provided AC with chiropractic treatment between August 2017 and October 2018. In October 2018, Abrams, Piazza, Julewicz, and APJ Chiro caused AC to be referred to JKC Pain in exchange for unlawful compensation that Chang and JKC Pain provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on October 23, 2018, Chang purported to examine AC on behalf of JKC Pain. In the October 23, 2018, examination report, Chang falsely contended that AC continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – AC had received over fourteen months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving AC's putative symptoms, Chang nonetheless referred AC back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the October 23, 2018, examination – over fourteen months after the accident, and long after any legitimate symptoms AC may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to JKC Pain.

(iv)   On September 29, 2017, an Insured named JV was involved in an automobile accident. Thereafter, JV sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided JV with chiropractic treatment between October 2017 and February 2020. In February 2020, Abrams, Piazza, Julewicz, and APJ Chiro caused JV to be referred to Chang PC in exchange for unlawful compensation that Chang and Chang PC provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on March 3, 2020, Chang purported to examine JV on behalf of Chang PC. In the March 3, 2020, examination report, Chang falsely contended that JV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – JV had received over twenty-eight months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving FQ's putative symptoms, Chang nonetheless referred JV back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the March 3, 2020, examination – over twenty-eight months after the accident, and long after any legitimate symptoms JV may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to Chang PC.

(v)   On December 23, 2018, an Insured named FQ was involved in an automobile accident. Thereafter, FQ sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided FQ with chiropractic treatment between December 2018 and March 2020. In March 2020, Abrams, Piazza, Julewicz, and APJ Chiro caused FQ to be referred to Chang PC in exchange for unlawful compensation that Chang and Chang PC provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on March 31, 2020, Chang purported to examine FQ on behalf of Chang PC. In the March 31, 2020, examination report, Chang falsely contended that FQ continued

to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – FQ had received over fifteen months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving FQ's putative symptoms, Chang nonetheless referred FQ back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the March 31, 2020, examination – over fifteen months after the accident, and long after any legitimate symptoms FQ may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to Chang PC.

(vi)    On December 23, 2018, an Insured named FQ was involved in an automobile accident. Thereafter, FQ sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided FQ with chiropractic treatment between December 2018 and June 2019. In June 2019, Abrams, Piazza, Julewicz, and APJ Chiro caused FQ to be referred to JKC Pain in exchange for unlawful compensation that Chang and JKC Pain provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on June 18, 2019, Chang purported to examine FQ on behalf of JKC Pain. In the June 18, 2019, examination report, Chang falsely contended that FQ continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – FQ had received nearly six months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving FQ's putative symptoms, Chang nonetheless referred FQ back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the June 18, 2019, examination – nearly six months after the accident, and long after any legitimate symptoms FQ may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to JKC Pain.

(vii)   On February 18, 2019, an Insured named AC was involved in an automobile accident. Thereafter, AC sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided AC with chiropractic treatment between February 2019 and July 2019. In July 2019, Abrams, Piazza, Julewicz, and APJ Chiro caused AC to be referred to JKC Pain in exchange for unlawful compensation that Chang and JKC Pain provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on July 23, 2019, Chang purported to examine AC on behalf of JKC Pain. In the July 23, 2019, examination report, Chang falsely contended that AC continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – AC had received over 5 months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving AC's putative symptoms, Chang nonetheless referred AC back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic

treatment at the conclusion of the July 23, 2019, examination – over 5 months after the accident, and long after any legitimate symptoms AC FQ may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to JKC Pain.

(viii)   On June 30, 2019, an Insured named KB was involved in an automobile accident. Thereafter, KB sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided KB with chiropractic treatment between August 2019 and February 2020. In February 2020, Abrams, Piazza, Julewicz, and APJ Chiro caused KB to be referred to Chang PC in exchange for unlawful compensation that Chang and Chang PC provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on February 4, 2020, Chang purported to examine KB on behalf of Chang PC. In the February 4, 2020, examination report, Chang falsely contended that KB continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – KB had received over five months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving KB's putative symptoms, Chang nonetheless referred KB back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the February 4, 2020, examination – over five months after the accident, and long after any legitimate symptoms KB may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to Chang PC.

(ix)   On August 24, 2019, an Insured named LM was involved in an automobile accident. Thereafter, LM sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided LM with chiropractic treatment between November 2019 and February 2020. In February 2020, Abrams, Piazza, Julewicz, and APJ Chiro caused LM to be referred to Chang PC in exchange for unlawful compensation that Chang and Chang PC provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on March 3, 2020, Chang purported to examine LM on behalf of Chang PC. In the March 3, 2020, examination report, Chang falsely contended that LM continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – LM had received nearly four months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving LM's putative symptoms, Chang nonetheless referred LM back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the March 3, 2020, examination – nearly four months after the accident, and long after any legitimate symptoms LM may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to Chang PC.

(x)    On November 12, 2019, an Insured named LR was involved in an automobile accident. Thereafter, LR sought treatment from APJ Chiro, Abrams, Piazza, and Julewicz, who provided LR with chiropractic treatment between November 2019 and February 2020. In February 2020, Abrams, Piazza, Julewicz, and APJ Chiro caused LR to be referred to Chang PC in exchange for unlawful compensation that Chang and Chang PC provided to Abrams, Piazza, Julewicz, and APJ Chiro. Thereafter, on February 18, 2020, Chang purported to examine LR on behalf of Chang PC. In the February 18, 2020, examination report, Chang falsely contended that LR continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – LR had received nearly three months of chiropractic services from Abrams, Piazza, Julewicz, and APJ Chiro. Though the chiropractic treatment that Abrams, Piazza, Julewicz, and APJ Chiro purportedly had provided supposedly had been ineffective in resolving LR's putative symptoms, Chang nonetheless referred LR back to Abrams, Piazza, Julewicz, and APJ Chiro for continued chiropractic treatment at the conclusion of the February 12, 2020, examination – nearly three months after the accident, and long after any legitimate symptoms LR may have experienced had resolved. The medically unnecessary return referral to Abrams, Piazza, Julewicz, and APJ Chiro was unlawful compensation for the initial, medically unnecessary referral to Chang PC.

95.    These are only representative examples. In the claims identified in Exhibits "1" – "3", APJ Chiro, Abrams, Piazza, and Julewicz regularly referred Insureds to JKC Pain and/or Chang PC, or caused them to be referred, in exchange for unlawful compensation from JKC Pain, Chang PC, and Chang.

## C.    The Fraudulent Charges for Initial Examinations by JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz

96.    Upon receiving a referral pursuant to the unlawful compensation that JKC Pain, Chang PC, and Chang paid to APJ Chiro, Abrams, Piazza, and Julewicz; JKC Pain, Chang PC, and Chang thereafter purported to provide virtually every Insured in the claims identified in Exhibits "2" and "3" with an initial examination.

97.    Similarly, prior to referring an Insured to JKC Pain, Chang PC, and Chang pursuant to their unlawful referral scheme, APJ Chiro, Abrams, Piazza, and Julewicz also provided virtually every Insured in the claims identified in Exhibit "1" with an initial examination.

98.     As set forth in Exhibits "2" and "3", Chang purported to perform virtually all of the putative initial examinations on behalf of JKC Pain and Chang PC, which were then billed through JKC Pain or Chang PC to GEICO under CPT code 99204, typically resulting in a charge of $300.00 for each purported initial examination.

99.     As set forth in Exhibit "1", Julewicz purported to perform virtually all of the putative initial examinations at APJ Chiro, which were then billed through APJ Chiro to GEICO under CPT code 99203, typically resulting in a charge of $200.00 for each purported initial examination.

100.    In the claims for initial examinations identified in Exhibits "1" – "3" the charges for the initial examinations were fraudulent in that they misrepresented JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz's eligibility to collect PIP Benefits in the first instance.

101.    In fact, JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz were not eligible to collect PIP Benefits in the claims for initial examinations that are identified in Exhibits "1" – "3", because – as a result of the fraudulent and unlawful scheme described herein – neither JKC Pain, Chang PC, APJ Chiro, nor the examinations were in compliance with all significant laws and regulations or licensing laws governing health care practice in New York and New Jersey.

102.    Moreover, and as set forth below, the charges for the initial examinations were also fraudulent in that they misrepresented the extent, nature, results, and medical necessity of the initial examinations.

**1.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

103.    For instance, in the claims for initial examinations under CPT code 99204 that are identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely misrepresented the severity of the Insureds' presenting problems.

104.    At all relevant times, pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the NY and NJ Fee Schedule, the use of CPT code 99204 to bill for an initial patient examination typically required that the patient present with problems of moderate to high severity.

105.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

106.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

107.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

108.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "2" and "3" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

109.    Even so, in the claims for initial examinations identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

110.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "2" and "3" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low or minimal severity, in the majority of the claims identified in Exhibit "2" and "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

111.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain and/or similar soft-tissue injury diagnosis.

112.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents

or injured at all.

113.    Even so, in the claims for initial examinations identified in Exhibit "2" and "3", JKC Pain, Chang PC, and Chang routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

114.    For example:

(i)    On July 26, 2016, an Insured named SD was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and did not complain of any pain. In keeping with the fact that SD was not seriously injured, SD did not visit any hospital emergency room immediately following the accident. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of SD on April 10, 2017, Chang and JKC Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On September 13, 2017, an Insured named ZB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZB's vehicle was drivable following the accident. The police report further indicated that ZB was not injured and did not complain of any pain. In keeping with the fact that ZB was not seriously injured, ZB did not visit any hospital emergency room immediately following the accident. Rather, one day after the accident, ZB presented to CITYMD urgent care where he was briefly observed and diagnosed with nothing more serious than minor strain or strain injuries. To the extent that ZB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of ZB on January 20, 2018, Chang and JKC Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On July 10, 2018, an Insured named HI was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HI's vehicle was drivable following the accident. The police report further indicated that HI was not injured and did not complain of any pain. Nonetheless HI self-presented to HMH Palisades Medical Center where he was observed on an outpatient basis and released shortly thereafter

with nothing more serious than a minor soft tissue sprain/strain diagnosis. To the extent that HI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of HI on August 18, 2018, Chang and JKC Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)     On September 5, 2018, an Insured named DH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DH's vehicle was drivable following the accident. The police report further indicated that DH was not injured and did not complain of any pain. In keeping with the fact that DH was not seriously injured, DH did not visit any hospital emergency room immediately following the accident. To the extent that DH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of DH on May 18, 2022, Chang and Chang PC billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)      On February 25, 2019, an Insured named HJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HJ's vehicle was drivable following the accident. The police report further indicated that HJ was not injured and did not complain of any pain. In keeping with the fact that HJ was not seriously injured, HJ did not visit any hospital emergency room immediately following the accident. To the extent that HJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of HJ on April 8, 2019, Chang and JKC Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)     On June 21, 2019, an Insured named MZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MZ's vehicle was drivable following the accident. The police report further indicated that MZ was not seriously injured. Nonetheless MZ presented to Jersey City Medical Center where he was observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that MZ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of MZ on August 2, 2019, Chang and JKC Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)     On July 31, 2019, an Insured named ZT was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZT's vehicle was drivable following the accident. The police report further indicated that ZT was not injured and did not complain of any pain. In keeping with the fact that ZT was not seriously injured, ZT did not visit any hospital emergency room immediately following the accident. To the extent that ZT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of ZT on October 5, 2019, Chang and Chang PC billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)    On August 13, 2019, an Insured named JA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not seriously injured. Nonetheless JA presented to Jersey City Medical Center where he was observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that JA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of JA on October 16, 2019, Chang and Chang PC billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)     On August 24, 2020, an Insured named TS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room immediately following the accident. To the extent that TS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of TS on January 27, 2021, Chang and Chang PC billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)     On July 16, 2021, an Insured named PP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain of any pain. In keeping with the fact that PP was not seriously injured, PP did not visit any hospital emergency room immediately following the accident. To

the extent that PP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of PP on October 15, 2021, Chang and Chang PC billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

115. These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

116. In the claims for initial examinations identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

117. In the claims for initial examinations identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

118. Additionally, in the claims identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz also fraudulently misrepresented the severity of the Insureds' presenting problems, in order to bill for their putative initial examinations under CPT Code 99203.

119.     Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99203 to bill for an initial patient examination typically required that the Insured present with problems of moderate severity.

120.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

121.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)     Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

122.     Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

123.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the

36

problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

124.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1", either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents.

125.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

126.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents or injured at all.

127.    Even so, in the claims for initial examinations identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

128.    For example:

(i)     On January 7, 2016, an Insured named EX was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EX's vehicle was drivable following the accident. The police report further indicated that EX was not injured and did not complain of any pain. Nonetheless, following the accident EX drove herself to Staten Island University Hospital South.  The contemporaneous hospital records indicate that EX was briefly observed on an outpatient basis and discharged with no serious injury diagnosis. To the extent that EX experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of EX

on January 15, 2016, Abrams, Piazza, Julewicz, and APJ Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)     On November 10, 2019, an Insured named TF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TF's vehicle was drivable following the accident. The police report further indicated that TF was not injured and did not complain of any pain. In keeping with the fact that TF was not seriously injured, TF did not visit any hospital emergency room following the accident. To the extent that TF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of TF on November 15, 2019, Abrams, Piazza, Julewicz, and APJ Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)    On November 19, 2019, an Insured named DF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DF's vehicle was drivable following the accident. The police report further indicated that DF was not injured and did not complain of any pain. In keeping with the fact that DF was not seriously injured, DF did not visit any hospital emergency room following the accident. To the extent that DF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of DF on November 26, 2019, Abrams, Piazza, Julewicz, and APJ Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)    On November 19, 2019, an Insured named AA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of AA on December 4, 2019, Abrams, Piazza, Julewicz, and APJ Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)     On May 4, 2021, an Insured named TF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TF's vehicle was drivable following the

accident. The police report further indicated that TF was not injured and did not complain of any pain. In keeping with the fact that TF was not seriously injured, TF did not visit any hospital emergency room following the accident. To the extent that TF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of TF on May 7, 2021, Abrams, Piazza, Julewicz, and APJ Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

129.    These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

130.    In the claims for initial examinations identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the putative examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

131.    In the claims for initial examinations identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

## 2.    Misrepresentations Regarding the Amount of Time Spent on the Purported Examinations

132.    Pursuant to the NY and NJ Fee Schedule, the use of CPT codes 99203 and 99204 to bill for an initial examination represents that the physician, chiropractor, or other health care

provider who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family when the examination was billed under CPT Code 99203, and 45 minutes of face-to-face time with the patient or the patient's family when billed under CPT Code 99204.

133.    As set forth in Exhibits "2" and "3" JKC Pain, Chang PC, and Chang submitted the vast majority of their bills for initial examinations under code 99204, and thereby represented that the physician who purported to perform the initial examinations – namely Chang – spent 45 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

134.    As set forth in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz submitted the vast majority of their bills for initial examinations under code 99203, and thereby represented that the individual who purported to perform the initial examinations – almost  always Julewicz – spent 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

135.    In fact, in the claims for initial examinations identified in Exhibit "2" and "3", neither Chang nor any other physician associated with JKC Pain or Chang PC ever spent 45 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

136.    Similarly, in the claims for initial examinations identified in Exhibit "1", neither Abrams, Piazza, Julewicz nor any other health care provider associated with APJ Chiro ever spent 30 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

137.    Rather, in the claims for initial examinations identified in Exhibits "1" – "3", the initial examinations did not entail more than 15 minutes of face-to-face time between the

examining health care provider and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

138. For instance, and in keeping with the fact that the initial examinations allegedly provided by Julewicz and Chang did not entail more than 15 minutes of face-to-face time with the Insureds or their families, Julewicz and Chang used template forms in purporting to conduct the initial examinations.

139. The template forms that Julewicz and Chang used to document the putative examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

140. All that was required to complete the template forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and other limited examinations of the Insureds' musculoskeletal systems.

141. These interviews and examinations did not require any physician, chiropractor, or other health care provider associated with JKC Pain, Chang PC, or APJ Chiro to spend more than 15 minutes of face-to-face time with the Insureds during the putative initial examinations.

142. In the claims for initial examinations identified in Exhibit "2" and "3", JKC Pain, Chang PC, and Chang falsely represented that the examinations involved 45 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99204 because examinations and consultations billable under CPT code 99204 are reimbursable at a higher rate than examinations that require less time to perform.

143. Similarly, in the claims for initial examinations identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz falsely represented that the examinations involved 30 minutes

of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203 because examinations and consultations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

### 3.     Misrepresentations Regarding "Detailed" or "Comprehensive" Physical Examinations

144.    Moreover, in the claims identified in Exhibit "1" for initial examinations under CPT code 99203, APJ Chiro, Abrams, Piazza, and Julewicz routinely falsely represented the nature and extent of the underlying physical examinations.

145.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99203 to bill for a patient examination represented that the chiropractor or other health care practitioner who performed the examination conducted a "detailed" physical examination.

146.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the chiropractor or other health care practitioner performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

147.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, such as sprains and strains.

148.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician, chiropractor, or other health care practitioner has not conducted an extended examination of a patient's musculoskeletal organ system unless the practitioner has documented findings with respect to the following:

> (i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

149.    In the claims for initial examinations identified in Exhibit "1", when APJ Chiro, Abrams, Piazza, and Julewicz billed for the initial examinations under CPT code 99203, they falsely represented that the chiropractor or other health care practitioner who purported to perform the examinations performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

150.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", neither APJ Chiro, Abrams, Piazza, Julewicz, nor any other health care practitioner associated with APJ Chiro conducted extended examinations of the Insureds' musculoskeletal systems.

151.    For instance, neither Abrams, Piazza, Julewicz, nor any other chiropractor or health care practitioner associated with APJ Chiro conducted extended examinations of the Insureds'

musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)   general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)  examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)    brief assessment of mental status;

(vi)   examination of gait and station;

(vii)  inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii) coordination;

(ix)   examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)    examination of sensation.

152.   For example:

(i)    On or about June 13, 2016, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named JL and thereby represented that they had provided a "detailed" physical examination to JL. However, no health care practitioner associated with APJ Chiro documented an extended examination of JL's musculoskeletal system, despite the fact that – to the extent JL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)   On or about February 7, 2017, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named MG and thereby represented that they had provided a "detailed" physical examination to MG. However, no health care practitioner

associated with APJ Chiro documented an extended examination of MG's musculoskeletal system, despite the fact that – to the extent MG had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)     On or about February 13, 2017, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named KW and thereby represented that they had provided a "detailed" physical examination to KW. However, no health care practitioner associated with APJ Chiro documented an extended examination of KW's musculoskeletal system, despite the fact that – to the extent KW had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)     On or about February 13, 2017, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named AJ and thereby represented that they had provided a "detailed" physical examination to AJ. However, no health care practitioner associated with APJ Chiro documented an extended examination of AJ's musculoskeletal system, despite the fact that – to the extent AJ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)      On or about August 9, 2017, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named JR and thereby represented that they had provided a "detailed" physical examination to JR. However, no health care practitioner associated with APJ Chiro documented an extended examination of JR's musculoskeletal system, despite the fact that – to the extent JR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)     On or about January 17, 2018, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named MP and thereby represented that they had provided a "detailed" physical examination to MP. However, no health care practitioner associated with APJ Chiro documented an extended examination of MP's musculoskeletal system, despite the fact that – to the extent MP had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)    On or about May 23, 2018, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named YC and thereby represented that they had provided a "detailed" physical examination to YC. However, no health care practitioner associated with APJ Chiro documented an extended examination of YC's musculoskeletal system,

despite the fact that – to the extent YC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)   On or about May 25, 2018, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named MG and thereby represented that they had provided a "detailed" physical examination to MG. However, no health care practitioner associated with APJ Chiro documented an extended examination of MG's musculoskeletal system, despite the fact that – to the extent MG had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)   On or about December 27, 2018, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named FQ and thereby represented that they had provided a "detailed" physical examination to FQ. However, no health care practitioner associated with APJ Chiro documented an extended examination of FQ's musculoskeletal system, despite the fact that – to the extent FQ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)   On or about April 16, 2019, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named OK and thereby represented that they had provided a "detailed" physical examination to OK. However, no health care practitioner associated with APJ Chiro documented an extended examination of OK's musculoskeletal system, despite the fact that – to the extent OK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

153.   These are only representative examples. In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because the examining chiropractors or other health care providers had not documented an extended examination of the Insureds' affected body areas and other symptomatic or related organ systems.

154.   In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their

charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining chiropractor or other health care practitioner to provide "detailed" physical examinations.

155.    At all relevant times, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represented that the physician who performed the examination conducted a "comprehensive" physical examination.

156.    A physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

157.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

158.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

159.    In the claims for initial examinations identified in Exhibits "2" and "3", when JKC Pain, Chang PC, and Chang billed for the initial examinations under CPT code 99204, they falsely represented that Chang or some other health care practitioner associated with JKC Pain and Chang PC performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

160.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibits "2" and "3", neither Chang nor any other health care practitioner associated with JKC Pain and Chang PC actually conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

161.    For instance, in the claims under CPT code 99204 identified in Exhibits "2" and "3", neither Chang nor any other health care practitioner associated with JKC Pain and Chang PC conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

162.    Furthermore, although Chang typically purported to provide an examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibits "2"

and "3", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

163.    For example:

(i)     On January 14, 2017, JKC Pain and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured JK, and thereby represented that they had provided a "comprehensive" physical examination to JK. However, neither Chang nor any other health care practitioner associated with JKC Pain documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)    On February 16, 2017, JKC Pain and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured JL, and thereby represented that they had provided a "comprehensive" physical examination to JL. However, neither Chang nor any other health care practitioner associated with JKC Pain documented

findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)     On April 10, 2017, JKC Pain and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured SD, and thereby represented that they had provided a "comprehensive" physical examination to SD. However, neither Chang nor any other health care practitioner associated with JKC Pain documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)     On August 18, 2018, JKC Pain and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured EM, and thereby represented that they had provided a "comprehensive" physical examination to EM. However, neither Chang nor any other health care practitioner associated with JKC Pain documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)      On April 8, 2019, JKC Pain and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured HJ, and thereby represented that they had provided a "comprehensive" physical examination to HJ. However, neither Chang nor any other health care practitioner associated with JKC Pain documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vi)     On June 25, 2021, Chang PC and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured NG, and thereby represented that they had provided a "comprehensive" physical examination to NG. However, neither Chang nor any other health care practitioner associated with Chang PC documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vii)    On September 29, 2021, Chang PC and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured MG, and thereby represented that they had provided a "comprehensive" physical examination to MG. However, neither Chang nor any other health care practitioner associated with Chang PC documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(viii)   On December 15, 2021, Chang PC and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured PP, and thereby represented that they had

provided a "comprehensive" physical examination to PP. However, neither Chang nor any other health care practitioner associated with Chang PC documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ix)     On December 17, 2021, Chang PC and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured ON, and thereby represented that they had provided a "comprehensive" physical examination to ON. However, neither Chang nor any other health care practitioner associated with Chang PC documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(x)     On April 13, 2022, Chang PC and Chang billed GEICO under CPT code 99204 for an initial examination of an Insured SH, and thereby represented that they had provided a "comprehensive" physical examination to SH. However, neither Chang nor any other health care practitioner associated with Chang PC documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

164.     These are only representative examples. In the claims for initial examinations under CPT code 99204 that are identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because the examining physician had not documented: (i) a general examination of multiple patient organ systems; or (ii) a complete examination of a single patient organ system.

## 4.     Misrepresentations Regarding the Extent of Medical Decision-Making

165.     Moreover, pursuant to the NY and NJ Fee Schedule, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in legitimate, "moderate complexity" medical decision-making.

166.    Similarly, pursuant to the NY and NJ Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the physician or other health care practitioner who performed the examination engaged in legitimate, "low complexity" medical decision-making.

167.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

168.    As set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate moderate complexity medical decision-making, and therefore support the use of CPT code 99204 to bill for an initial examination, typically are problems that pose a serious threat to the patient's health, or even the patient's life.

169.    Similarly, as set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate low complexity medical decision-making, and therefore support the use of CPT code 99203 to bill for an initial examination, typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

170.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" – "3", had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

171.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate low or moderate complexity medical decision-making.

172.    In JKC Pain and Chang PC's claims for initial examinations identified in Exhibits "2" and "3", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

173.    Similarly, in APJ Chiro, Abrams, Piazza, and Julewicz's claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

174.    In fact, when the Insureds in the claims identified in Exhibits "1" – "3" presented to JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz for the putative initial examinations, they did not arrive with any medical records except, occasionally, basic radiology or electrodiagnostic testing reports. Furthermore, prior to the initial examinations, the Defendants neither requested any medical records from any other providers, nor conducted any diagnostic tests.

175.    Second, in the claims for initial examinations identified in Exhibits "1" – "3", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they had any continuing complaints arising from the automobile accidents at all.

176.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by to JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

177.    In almost every instance, any "treatments" that to JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz actually provided were limited to the Fraudulent Services, none of which was health or life threatening if properly performed.

178.    Third, in JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz's claims for initial examinations identified in Exhibits "1" – "3", JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

179.    Specifically, in the vast majority of claims identified in Exhibits "1" – "3", during the initial examinations the Insureds did not present with any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

180.    Even so, JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz prepared initial examination reports in which they provided a phony series of objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

181.    Then, based upon these phony "diagnoses", JKC Pain, Chang PC, and Chang directed Insureds: (i) to continue to receive medically unnecessary chiropractic and physical therapy treatment – often from APJ Chiro, Abrams, Piazza, and Julewicz as unlawful compensation for their initial referrals of the Insureds – despite the fact that the Insureds typically had already received months of chiropractic and physical therapy treatment that supposedly had not remediated their purported symptoms; and (ii) to receive medically unwarranted EDX testing and interventional pain management injections from JKC Pain and Chang PC – which were performed at Union ASC, an ambulatory surgery center which Chang owned – regardless of the Insureds' individual circumstances.

182.    For example:

(i)     On January 7, 2016, an Insured named EX was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EX's vehicle was drivable following the accident. The police report further indicated that EX was not injured and did not complain of any pain. Nonetheless, following the accident EX drove herself to Staten Island University Hospital South. The contemporaneous hospital records indicate that EX was briefly observed on an outpatient basis and discharged with no serious injury diagnosis. To the extent that EX experienced any health problems at all as the result of the accident, they were of low or minimal severity. On January 15, 2016, Julewicz purported to conduct an initial examination of EX. Julewicz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Julewicz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Julewicz provided EX with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EX's presenting problems, nor the treatment plan provided to EX by APJ Chiro and Julewicz, presented any risk of significant complications, morbidity, or mortality. To the contrary, EX did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by APJ Chiro and Julewicz consisted of medically unnecessary chiropractic, physical therapy, and EDX testing services, which did not pose the least bit of risk to EX. Even so, APJ Chiro, Abrams, Piazza, and Julewicz  billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Julewicz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On July 26, 2016, an Insured named SD was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and did not complain of any pain. In keeping with the fact that SD was not seriously injured, SD did not visit any hospital emergency room immediately following the accident. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity. On April 10, 2017, Chang purported to conduct an initial examination of SD. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology and/or electrodiagnostic testing reports. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided SD with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SD's presenting problems, nor the treatment plan provided to SD by JKC Pain and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, SD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided

by JKC Pain and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to SD. Even so, JKC Pain and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On September 13, 2017, an Insured named ZB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZB's vehicle was drivable following the accident. The police report further indicated that ZB was not injured and did not complain of any pain. In keeping with the fact that ZB was not seriously injured, ZB did not visit any hospital emergency room immediately following the accident. Rather, one day after the accident, ZB presented to CITYMD urgent care were he was briefly observed and diagnosed with nothing more serious than minor strain or strain injuries. To the extent that ZB experienced any health problems at all as the result of the accident, they were of low or minimal severity. On January 20, 2018, Chang purported to conduct an initial examination of ZB. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided ZB with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ZB's presenting problems, nor the treatment plan provided to ZB by JKC Pain and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, ZB did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by JKC Pain and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to ZB. Even so, JKC Pain and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)    On July 10, 2018, an Insured named HI was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HI's vehicle was drivable following the accident. The police report further indicated that HI was not injured and did not complain of any pain. Nonetheless HI self-presented to HMH Palisades Medical Center where he was observed on an outpatient basis and released shortly thereafter with nothing more serious than a minor soft tissue sprain/strain diagnosis. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 18, 2018, Chang purported to conduct an initial examination of HI. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in

connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided HI with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HI's presenting problems, nor the treatment plan provided to HI by JKC Pain and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, HI did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by JKC Pain and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to HI. Even so, JKC Pain and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On September 5, 2018, an Insured named DH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DH's vehicle was drivable following the accident. The police report further indicated that DH was not injured and did not complain of any pain. In keeping with the fact that DH was not seriously injured, DH did not visit any hospital emergency room immediately following the accident. To the extent that DH experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 18, 2022, Chang purported to conduct an initial examination of DH. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided DH with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DH's presenting problems, nor the treatment plan provided to DH by Chang PC and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, DH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Chang PC and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to DH. Even so, Chang PC and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)    On February 25, 2019, an Insured named HJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HJ's vehicle was drivable following the accident. The police report further indicated that HJ was not injured and did not complain of any pain. In keeping with the fact that HJ was not seriously injured, HJ did not visit any hospital emergency room immediately following the accident. To

the extent that HJ experienced any health problems at all as the result of the accident, they were of low or minimal severity. On April 8, 2019, Chang purported to conduct an initial examination of HJ. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided HJ with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HJ's presenting problems, nor the treatment plan provided to HJ by JKC Pain and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, HJ did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by JKC Pain and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to HJ. Even so, JKC Pain and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)   On June 21, 2019, an Insured named MZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MZ's vehicle was drivable following the accident. The police report further indicated that MZ was not seriously injured. Nonetheless MZ presented to Jersey City Medical Center where he was observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that MZ experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 2, 2019, Chang purported to conduct an initial examination of MZ. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided MZ with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MZ's presenting problems, nor the treatment plan provided to MZ by JKC Pain and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, MZ did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by JKC Pain and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to MZ. Even so, JKC Pain and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)   On July 31, 2019, an Insured named ZT was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-

speed, low-impact collision, and that ZT's vehicle was drivable following the accident. The police report further indicated that ZT was not injured and did not complain of any pain. In keeping with the fact that ZT was not seriously injured, ZT did not visit any hospital emergency room immediately following the accident. To the extent that ZT experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 18, 2022, Chang purported to conduct an initial examination of ZT. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided ZT with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ZT's presenting problems, nor the treatment plan provided to ZT by Chang PC and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, ZT did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Chang PC and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to ZT. Even so, Chang PC and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)     On August 13, 2019, an Insured named JA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not seriously injured. Nonetheless JA presented to Jersey City Medical Center where he was observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that JA experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 16, 2019, Chang purported to conduct an initial examination of JA. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided JA with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JA's presenting problems, nor the treatment plan provided to JA by Chang PC and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, JA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Chang PC and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to JA. Even so, Chang PC and Chang billed GEICO for the initial examination using CPT code 99204,

and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)    On November 10, 2019, an Insured named TM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TF's vehicle was drivable following the accident. The police report further indicated that TF was not injured and did not complain of any pain. In keeping with the fact that TF was not seriously injured, TF did not visit any hospital emergency room following the accident. To the extent that TF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 15, 2019, Julewicz purported to conduct an initial examination of TF. Julewicz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Julewicz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Julewicz provided TF with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TF's presenting problems, nor the treatment plan provided to TF by APJ Chiro and Julewicz, presented any risk of significant complications, morbidity, or mortality. To the contrary, TF did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by APJ Chiro and Julewicz consisted of medically unnecessary chiropractic, physical therapy, and EDX testing, which did not pose the least bit of risk to TF. Even so, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Julewicz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)    On November 19, 2019, an Insured named DF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DF's vehicle was drivable following the accident. The police report further indicated that DF was not injured and did not complain of any pain. In keeping with the fact that DF was not seriously injured, DF did not visit any hospital emergency room following the accident. To the extent that DF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 26, 2019, Julewicz purported to conduct an initial examination of DF. Julewicz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Julewicz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Julewicz provided DF with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DF's presenting problems, nor the treatment plan provided to DF by APJ Chiro and Julewicz, presented any risk of significant complications, morbidity, or mortality. To the contrary, DF did not need any extensive treatment at all as a result of the accident, and the treatment plan

provided by APJ Chiro and Julewicz consisted of medically unnecessary chiropractic, physical therapy, and EDX testing, which did not pose the least bit of risk to DF. Even so, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Julewicz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)   On November 19, 2019, an Insured named AA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as the result of the accident, they were of low or minimal severity. On December 4, 2019, Julewicz purported to conduct an initial examination of AA. Julewicz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Julewicz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Julewicz provided AA with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AA's presenting problems, nor the treatment plan provided to AA by APJ Chiro and Julewicz, presented any risk of significant complications, morbidity, or mortality. To the contrary, AA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by APJ Chiro and Julewicz consisted of medically unnecessary chiropractic, physical therapy, and EDX testing services, which did not pose the least bit of risk to AA. Even so, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Julewicz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)   On August 24, 2020, an Insured named TS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room immediately following the accident. To the extent that TS experienced any health problems at all as the result of the accident, they were of low or minimal severity. On January 27, 2021, Chang purported to conduct an initial examination of TS. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided TS with substantially the same, phony list of objectively unverifiable soft tissue

injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TS's presenting problems, nor the treatment plan provided to TS by Chang PC and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, TS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Chang PC and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to TS. Even so, Chang PC and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv) On May 4, 2021, an Insured named TF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TF's vehicle was drivable following the accident. The police report further indicated that TF was not injured and did not complain of any pain. In keeping with the fact that TF was not seriously injured, TF did not visit any hospital emergency room following the accident. To the extent that TF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 7, 2021, Julewicz purported to conduct an initial examination of TF. Julewicz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Julewicz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Julewicz provided TF with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TF's presenting problems, nor the treatment plan provided to TF by APJ Chiro and Julewicz, presented any risk of significant complications, morbidity, or mortality. To the contrary, TF did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by APJ Chiro and Julewicz consisted of medically unnecessary chiropractic, physical therapy, and EDX testing services, which did not pose the least bit of risk to TF. Even so, APJ Chiro, Abrams, Piazza, and Julewicz billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Julewicz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv) On July 16, 2021, an Insured named PP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain of any pain. In keeping with the fact that PP was not seriously injured, PP did not visit any hospital emergency room immediately following the accident. To the extent that PP experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 15, 2021, Chang purported to conduct an initial examination of PP. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other

information in connection with the examination – beyond basic radiology testing reports. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided PP with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PP's presenting problems, nor the treatment plan provided to PP by Chang PC and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, PP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Chang PC and Chang consisted of medically unnecessary physical therapy, EDX testing, and interventional pain management services, which did not pose the least bit of risk to PP. Even so, Chang PC and Chang billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Chang engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

183.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

184.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

185.    As set forth above, virtually all of the Insureds whom JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz purported to treat were involved in relatively minor accidents.

186.    It is highly improbable that any two Insureds involved in any one of these minor automobile accidents would suffer substantially identical injuries as the result of their accidents or require a substantially identical course of treatment.

187.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at JKC Pain, Chang PC, and APJ Chiro with substantially identical injuries on or about the exact same dates, days, weeks, or even months after their accidents.

188.    Even so, and in keeping with the fact that JKC Pain, Chang PC, Chang, APJ Chiro,

Abrams, Piazza, and Julewicz's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz frequently issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

189.    For example:

(i)     On April 4, 2016, two Insureds – ND and RD – were involved in the same automobile accident. One week later, ND and RD presented – incredibly – on the exact same date, April 11, 2016, to APJ Chiro for initial examinations. ND and RD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ND and RD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Julewicz provided ND and RD with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ii)    On August 30, 2016, two Insureds – ES and OD – were involved in the same automobile accident. Nearly one month later, ES and OD presented – incredibly – on the exact same date, October 24, 2016, to JKC Pain for initial examinations. ES and OD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ES and OD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided ES and OD with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iii)   On October 15, 2016, two Insureds – JR and SZ – were involved in the same automobile accident. Nearly one month later, JR and SZ presented – incredibly – on the exact same date, November 7, 2016, to JKC Pain for initial examinations. JR and SZ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JR and SZ suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided JR and SZ with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iv)    On January 27, 2017, two Insureds – AJ and KW – were involved in the same automobile accident. Over two weeks later, AJ and KW presented – incredibly –

on the exact same date, February 13, 2017, to APJ Chiro for initial examinations. AJ and KW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AJ and KW suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Julewicz provided AJ and KW with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(v)    On February 3, 2017, two Insureds – AC and JP – were involved in the same automobile accident. Over three months later, AC and JP presented – incredibly – on the exact same date, May 26, 2017, to JKC Pain for initial examinations. AC and JP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AC and JP suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided AC and JP with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vi)   On January 27, 2017, two Insureds – RC and YC – were involved in the same automobile accident. Over two weeks later, RC and YC presented – incredibly – on the exact same date, May 23, 2018, to APJ Chiro for initial examinations. RC and YC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RC and YC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Julewicz provided RC and YC with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vii)  On May 17, 2018, two Insureds – RC and YC – were involved in the same automobile accident. Over two months later, RC and YC presented – incredibly – on the exact same date, August 7, 2018, to JKC Pain for initial examinations. RC and YC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RC and YC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided RC and YC with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(viii) On July 10, 2018, four Insureds – HI, EM, SM, and SM – were involved in the same automobile accident. Over one month later, HI, EM, SM, and SM presented – incredibly – on the exact same date, August 18, 2018, to JKC Pain for initial examinations. HI, EM, SM, and SM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HI, EM, SM, and SM suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided HI, EM, SM, and SM with substantially identical

"diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ix)     On October 13, 2019, two Insureds – DC and LC – were involved in the same automobile accident. One week later, DC and LC presented – incredibly – <u>on the exact same date</u>, October 23, 2019, to APJ Chiro for initial examinations. DC and LC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DC and LC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Julewicz provided DC and LC with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(x)      On October 13, 2019, two Insureds – DC and LC – were involved in the same automobile accident. Over fourteen month later, DC and LC presented – incredibly – <u>on the exact same date</u>, February 4, 2020, to Chang PC for initial examinations. DC and LC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DC and LC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided DC and LC with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xi)     On November 19, 2019, two Insureds – DF and CF – were involved in the same automobile accident. One week later, DF and CF presented – incredibly – <u>on the exact same date</u>, November 26, 2019, to APJ Chiro for initial examinations. DF and CF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DF and CF suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Julewicz provided DF and CF with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xii)    On October 16, 2020, two Insureds – JC and IL – were involved in the same automobile accident. Over fourteen month later, JC and IL presented – incredibly – <u>on the exact same date</u>, February 4, 2020, to Chang PC for initial examinations. JC and IL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JC and IL suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided JC and IL with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiii)   On February 29, 2021, two Insureds – JC and AD – were involved in the same automobile accident. Over fourteen months later, JC and AD presented – incredibly – <u>on the exact same date</u>, May 20, 2022, to Chang PC for initial examinations. JC

and AD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JC and AD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided JC and AD with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiv)   On May 30, 2021, two Insureds – ED and MR – were involved in the same automobile accident. Over fourteen months later, ED and MR presented – incredibly – <u>on the exact same date</u>, February 2, 2022, to Chang PC for initial examinations. ED and MR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ED and MR suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided ED and MR with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

190.   These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "3", JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

191.   JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

192.   In the claims for initial examinations identified in Exhibits "1" – "3", JKC Pain, Chang PC, Chang, APJ Chiro, Abrams, Piazza, and Julewicz routinely falsely represented that the putative examinations involved medical decision making of low to moderate complexity in order

to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

## D.     The Fraudulent Charges for Follow-Up Examinations by JKC Pain, Chang PC, and Chang

193.    JKC Pain, Chang PC, and Chang typically purported to subject the Insureds in the claims identified in Exhibits "2" and "3" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

194.    As set forth in Exhibits "2" and "3", Chang purported to perform virtually all of the putative follow-up examinations at JKC Pain and Chang PC, which were then billed to GEICO under CPT code 99213, typically resulting in a charge of between $200.00 and $250.00 for each purported follow-up examination.

195.    All of JKC Pain, Chang PC, and Chang's billing for their purported follow-up examinations was fraudulent because it misrepresented JKC Pain, Chang PC, and Chang's eligibility to collect PIP Benefits in the first instance.

196.    In fact, JKC Pain, Chang PC, and Chang never were eligible to collect PIP Benefits in the claims for follow-up examinations that are identified in Exhibits "2" and "3", because they engaged in unlawful and fraudulent conduct as described herein.

197.    For instance, JKC Pain, Chang PC, and Chang paid unlawful compensation in exchange for patient referrals, and in the case of JKC Pain, a significant portion of the claims for follow-up examinations identified in Exhibit "2" were unlawful because they were provided in New York in violation of New York law, as JKC Pain lacked the authority to operate as a medical practice in New York.

198.    Moreover, and as set forth below, JKC Pain, Chang PC, and Chang's charges for the putative follow-up examinations identified in Exhibits "2" and "3" were fraudulent in that they misrepresented the nature, extent, results, and medical necessity of the purported examinations.

**1.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

199.    For instance, in the claims for follow-up examinations that are identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely misrepresented the severity of the Insureds' presenting problems.

200.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

201.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

202.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

    (i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

    (ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

    (iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

    (iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

    (v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

203.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

204.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "2" and "3" suffered any injuries at all in their minor automobile accidents, the injuries were minor soft tissue injuries such as sprains and strains.

205.    By the time the Insureds in the claims identified in Exhibits "2" and "3" presented to JKC Pain, Chang PC, and Chang for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

206.    Even so, in the claims for follow-up examinations identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely billed for their putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity at the time of the purported examinations.

207.    For example:

(i)     On July 26, 2016, an Insured named SM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured and did not complain of any pain. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room immediately following the accident. To the extent that SM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of SM on November 18, 2017 – over fifteen months after

the accident – JKC Pain and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that SM presented with problems of low to moderate severity at the follow-up examination.

(ii)    On September 13, 2017, an Insured named ZB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZB's vehicle was drivable following the accident. The police report further indicated that ZB was not injured and did not complain of any pain. In keeping with the fact that ZB was not seriously injured, ZB did not visit any hospital emergency room immediately following the accident. Rather, one day after the accident, ZB presented to CITYMD urgent care were he was briefly observed and diagnosed with nothing more serious than minor strain or strain injuries. To the extent that ZB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of ZB on August 18, 2018 – over eleven months after the accident – JKC Pain and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ZB presented with problems of low to moderate severity at the follow-up examination.

(iii)    On September 13, 2017, an Insured named ZB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZB's vehicle was drivable following the accident. The police report further indicated that ZB was not injured and did not complain of any pain. In keeping with the fact that ZB was not seriously injured, ZB did not visit any hospital emergency room immediately following the accident. Rather, one day after the accident, ZB presented to CITYMD urgent care were he was briefly observed and diagnosed with nothing more serious than minor strain or strain injuries. To the extent that ZB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of ZB on December 9, 2019 – over twenty-six months after the accident – Chang PC and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ZB presented with problems of low to moderate severity at the follow-up examination.

(iv)    On July 10, 2018, an Insured named HI was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HI's vehicle was drivable following the accident. The police report further indicated that HI was not injured and did not complain of any pain. Nonetheless HI self-presented to HMH Palisades Medical Center where he was observed on an outpatient basis and released shortly thereafter with nothing more serious than a minor soft tissue sprain/strain diagnosis. To the extent that HI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-

up examination of HI on August 5, 2019 – over one year after the accident – JKC Pain and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HI presented with problems of low to moderate severity at the follow-up examination.

(v)     On July 10, 2018, an Insured named HI was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HI's vehicle was drivable following the accident. The police report further indicated that HI was not injured and did not complain of any pain. Nonetheless HI self-presented to HMH Palisades Medical Center where he was observed on an outpatient basis and released shortly thereafter with nothing more serious than a minor soft tissue sprain/strain diagnosis. To the extent that HI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of HI on October 28, 2019 – over fifteen months after the accident – Chang PC and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HI presented with problems of low to moderate severity at the follow-up examination.

(vi)    On February 25, 2019, an Insured named HJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HJ's vehicle was drivable following the accident. The police report further indicated that HJ was not injured and did not complain of any pain. In keeping with the fact that HJ was not seriously injured, HJ did not visit any hospital emergency room immediately following the accident. To the extent that HJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of HJ on September 9, 2019 – over six months after the accident – JKC Pain and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HJ presented with problems of low to moderate severity at the follow-up examination.

(vii)   On June 21, 2019, an Insured named MZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MZ's vehicle was drivable following the accident. The police report further indicated that MZ was not seriously injured. Nonetheless MZ presented to Jersey City Medical Center where he was observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that MZ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MZ on August 30, 2019 – over two months after the accident – JKC Pain and Chang billed GEICO for the follow-up

examination using CPT code 99213, and thereby falsely represented that MZ presented with problems of low to moderate severity at the follow-up examination.

(viii)   On July 31, 2019, an Insured named ZT was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZT's vehicle was drivable following the accident. The police report further indicated that ZT was not injured and did not complain of any pain. In keeping with the fact that ZT was not seriously injured, ZT did not visit any hospital emergency room immediately following the accident. To the extent that ZT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of ZT on November 3, 2020 – over fifteen months after the accident – Chang PC and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ZT presented with problems of low to moderate severity at the follow-up examination.

(ix)    On August 24, 2020, an Insured named TS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room immediately following the accident. To the extent that TS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of TS on March 24, 2021 – seven months after the accident – Chang PC and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that TS presented with problems of low to moderate severity at the follow-up examination.

(x)     On July 16, 2021, an Insured named PP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain of any pain. In keeping with the fact that PP was not seriously injured, PP did not visit any hospital emergency room immediately following the accident. To the extent that PP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of PP on November 12, 2021 – nearly four months after the accident – Chang PC and Chang billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that PP presented with problems of low to moderate severity at the follow-up examination.

208.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

209.    In the claims for follow-up examinations identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

210.    In the claims for follow-up examinations identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide.

**2.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

211.    Pursuant to the CPT Assistant, when JKC Pain, Chang PC, and Chang billed for their putative follow up examinations under CPT code 99213, they represented that the physicians or other health care providers who performed the examinations – virtually always Chang – performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

212.    In actuality, however, the physicians or other health care providers who performed the examinations did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

213.    Rather, following the purported follow-up examinations, Chang simply reiterated the phony soft tissue injury "diagnoses" from the Insureds' initial examinations or previous follow-up examinations, recommended continued chiropractic and/or physical therapy treatment, interventional pain management services, and additional follow-up examinations, or discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

214.    In the claims for initial examinations identified in Exhibits "2" and "3", the Defendants routinely fraudulently misrepresented that the follow-up examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative follow-up examinations misrepresented the nature and extent of the examinations; and

(iii)   the Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in pervasive violation of New York and New Jersey law.

215.    In keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary treatments by the Defendants, and to provide a false justification for the medically unnecessary treatments that the Defendants already had purported to provide, JKC Pain, Chang PC, and Chang routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor

underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

216.   For example:

(i)   On July 26, 2016, an Insured named SD was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and did not complain of any pain. In keeping with the fact that SD was not seriously injured, SD did not visit any hospital emergency room immediately following the accident. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SD by Chang on November 18, 2017 – over three months after the accident – Chang falsely reported that SD continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that SD return to JKC Pain for the continued provision of the Fraudulent Services.

(ii)   On September 13, 2017, an Insured named ZB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZB's vehicle was drivable following the accident. The police report further indicated that ZB was not injured and did not complain of any pain. In keeping with the fact that ZB was not seriously injured, ZB did not visit any hospital emergency room immediately following the accident. Rather, one day after the accident, ZB presented to CITYMD urgent care were he was briefly observed and diagnosed with nothing more serious than minor strain or strain injuries. To the extent that ZB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of ZB by Chang on August 18, 2018 – over eleven months after the accident – Chang falsely reported that ZB continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that ZB return to JKC Pain for the continued provision of the Fraudulent Services.

(iii)   On September 13, 2017, an Insured named ZB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZB's vehicle was drivable following the accident. The police report further indicated that ZB was not injured and did not complain of any pain. In keeping with the fact that ZB was not seriously injured, ZB did not visit any hospital emergency room immediately following the accident. Rather, one day after the accident, ZB presented to CITYMD urgent care were he was briefly observed and diagnosed with nothing more serious than minor strain or

strain injuries. To the extent that ZB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of ZB by Chang on September 30, 2019 – over two years after the accident – Chang falsely reported that ZB continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that ZB return to Chang PC for the continued provision of the Fraudulent Services.

(iv)     On July 10, 2018, an Insured named HI was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HI's vehicle was drivable following the accident. The police report further indicated that HI was not injured and did not complain of any pain. Nonetheless HI self-presented to HMH Palisades Medical Center where he was observed on an outpatient basis and released shortly thereafter with nothing more serious than a minor soft tissue sprain/strain diagnosis. To the extent that HI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HI by Chang on July 8, 2019 – nearly one year after the accident – Chang falsely reported that HI continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that HI return to JKC Pain for the continued provision of the Fraudulent Services.

(v)      On July 10, 2018, an Insured named HI was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HI's vehicle was drivable following the accident. The police report further indicated that HI was not injured and did not complain of any pain. Nonetheless HI self-presented to HMH Palisades Medical Center where he was observed on an outpatient basis and released shortly thereafter with nothing more serious than a minor soft tissue sprain/strain diagnosis. To the extent that HI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HI by Chang on September 16, 2019 – over thirteen months after the accident – Chang falsely reported that HI continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that HI return to Chang PC for the continued provision of the Fraudulent Services.

(vi)     On February 25, 2019, an Insured named HJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HJ's vehicle was drivable following the accident. The police report further indicated that HJ was not injured and did not complain of any pain. In keeping with the fact that HJ was not seriously injured, HJ did not visit any hospital emergency room immediately following the accident. To

the extent that HJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HJ by Chang on August 10, 2019 – nearly six months after the accident – Chang falsely reported that HJ continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that HJ return to JKC Pain for the continued provision of the Fraudulent Services.

(vii)   On June 21, 2019, an Insured named MZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MZ's vehicle was drivable following the accident. The police report further indicated that MZ was not seriously injured. Nonetheless MZ presented to Jersey City Medical Center where he was observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that MZ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MZ by Chang on August 30, 2019 – over two months after the accident – Chang falsely reported that MZ continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that MZ return to JKC Pain for the continued provision of the Fraudulent Services.

(viii)  On July 31, 2019, an Insured named ZT was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZT's vehicle was drivable following the accident. The police report further indicated that ZT was not injured and did not complain of any pain. In keeping with the fact that ZT was not seriously injured, ZT did not visit any hospital emergency room immediately following the accident. To the extent that ZT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of ZT by Chang on September 18, 2020 – over one year after the accident – Chang falsely reported that ZT continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that ZT return to Chang PC for the continued provision of the Fraudulent Services.

(ix)    On August 24, 2020, an Insured named TS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room immediately following the accident. To the extent that TS experienced any health problems at all as the result of the

accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of TS by Chang on March 19, 2021 – nearly seven months after the accident – Chang falsely reported that TS continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that TS return to Chang PC for the continued provision of the Fraudulent Services.

(x)     On July 16, 2021, an Insured named PP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PP's vehicle was drivable following the accident. The police report further indicated that PP was not injured and did not complain of any pain. In keeping with the fact that PP was not seriously injured, PP did not visit any hospital emergency room immediately following the accident. To the extent that PP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PP by Chang on November 12, 2021 – nearly four months after the accident – Chang falsely reported that PP continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that PP return to Chang PC for the continued provision of the Fraudulent Services.

217.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "2" – "3", JKC Pain, Chang PC, and Chang routinely falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their minor automobile accidents, often long after the minor accidents occurred.

218.    In the claims for follow-up examinations identified in Exhibits "2" – "3", JKC Pain, Chang PC, and Chang routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional follow-up examinations and continued referrals for long-term, medically unnecessary chiropractic and/or physical therapy services, EDX testing, and pain management injections,.

**E.**      **The Defendants' Fraudulent Charges for Electrodiagnostic Testing**

219.      Based upon the fraudulent, pre-determined findings and diagnoses provided during the Defendants' initial and/or follow-up examinations, and the Defendants' unlawful referral scheme, the Defendants purported to subject many of the Insureds in the claims identified in Exhibits "1" – "3" to a series of medically unnecessary EDX tests, specifically nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests.

220.      Palumbo purported to perform the EDX tests on behalf of APJ Chiro, and Chang purported to perform the EDX tests on behalf of JKC Pain and Chang PC.

221.      As set forth in Exhibits "1" – "3", the Defendants then billed the EDX tests through APJ Chiro, JKC Pain, and Chang PC to GEICO under CPT codes 95860, 95861, 95870, 95886, 95900, 95903, 95904, 95910, 95911, 95912, 95913, 95934, 95940, 95961, typically resulting in thousands of dollars in charges per Insured.

222.      In the claims for EDX tests identified in Exhibits "1" – "3", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony boilerplate "findings" and "diagnoses" that the Defendants purported to provide during their phony initial and/or follow-up examinations.

223.      Moreover, in the claims for EDX tests identified in Exhibits ""1" – "3", the charges for the EDX tests were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

224.      In fact, the Defendants never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" – "3", because – as a result of the fraudulent conduct

described herein – the Defendants and the EDX tests were not in compliance with all significant laws and regulations governing health care practice in New York and New Jersey.

**1.    The Human Nervous System and Electrodiagnostic Testing**

225.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

226.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

227.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

228.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

229.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

230.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

## 2.    The Fraudulent NCV Tests

231.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

232.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

233.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

234.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

235.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

236.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the Defendants routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers JKC Pain, Chang PC, Chang, APJ Chiro, and Palumbo routinely purported to perform and/or provide: (i) NCV tests of 4-8 motor nerves; (ii) NCV tests of 4-10 sensory nerves; as well as (iii) multiple F-wave studies.

237.    For example:

(i)     On July 17, 2015, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide 4 motor nerve NCV tests and 4 sensory nerve NCV tests to an Insured named JH, supposedly to determine whether JH suffered from a radiculopathy.

(ii)    On February 13, 2016, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide 4 motor nerve NCV tests 4 sensory nerve NCV tests, and multiple F-wave studies to an Insured named KF, supposedly to determine whether KF suffered from a radiculopathy.

(iii)    On February 10, 2018, JKC Pain and Chang purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named ZB, supposedly to determine whether ZB suffered from a radiculopathy.

(iv)    On April 26, 2019, JKC Pain and Chang purported to provide 4 motor nerve NCV tests and 6 sensory nerve NCV tests to an Insured named RL, supposedly to determine whether RL suffered from a radiculopathy.

(v)    On April 29, 2019, JKC Pain and Chang purported to provide 6 motor nerve NCV tests, 8 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named EM, supposedly to determine whether EM suffered from a radiculopathy.

(vi)    On July 24, 2019, JKC Pain and Chang purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named JR, supposedly to determine whether JR suffered from a radiculopathy.

(vii)    On August 30, 2019, JKC Pain and Chang purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named FS, supposedly to determine whether FS suffered from a radiculopathy.

(viii)    On October 30, 2019, Chang PC and Chang purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named MZ, supposedly to determine whether MZ suffered from a radiculopathy.

(ix)    On February 21, 2020, Chang PC and Chang purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named TD, supposedly to determine whether TD suffered from a radiculopathy.

(x)    On March 20, 2020, Chang PC and Chang purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named LG, supposedly to determine whether LG suffered from a radiculopathy.

(xi)    On May 1, 2020, APJ Chiro and Palumbo purported to provide 4 motor nerve NCV tests and 6 sensory nerve NCV tests to an Insured named SP, supposedly to determine whether SP suffered from a radiculopathy.

(xii)    On May 1, 2020, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide 4 motor nerve NCV tests and 6 sensory nerve NCV tests to an Insured named AR, supposedly to determine whether AR suffered from a radiculopathy.

(xiii)    On January 19, 2021, Chang PC and Chang purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named LR, supposedly to determine whether LR suffered from a radiculopathy.

(xiv)   On March 12, 2021, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide 4 motor nerve NCV tests and 6 sensory nerve NCV tests to an Insured named SP, supposedly to determine whether SP suffered from a radiculopathy.

(xv)   On October 30, 2019, Chang PC and Chang purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named JT, supposedly to determine whether JT suffered from a radiculopathy.

238.   These are only representative examples. In the substantial majority of the claims for NCV tests identified in Exhibits "1" – "3", the Defendants routinely purported to perform and/or provide an excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

239.   The Defendants routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies.

240.   Furthermore, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

241.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

242.   This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

243.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

244.    The Defendants did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

245.    Instead, the Defendants applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the claims identified in Exhibits "1" – "3".

246.    Specifically, in virtually every claim for NCV testing identified in Exhibits "1" – "3", the Defendants purported to test some combination of the following peripheral nerves and nerve fibers – and, in a substantial number of cases, all of them – for each Insured to whom they purported to provide NCV tests:

(i)      left and right median motor nerves;

(ii)     left and right peroneal motor nerves;

(iii)    left and right tibial motor nerves;

(iv)    left and right ulnar motor nerves;

(v)     left and right median sensory nerves;

(vi)    left and right radial sensory nerves;

(vii)   left and right sup peron sensory nerves;

(viii)  left and right sural sensory nerves;

(ix)    left and right ulnar sensory nerves

247.    The cookie-cutter approach to the NCVs that the Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that JKC Pain, Chang PC, Chang, APJ Chiro,

Abrams, Piazza, Julewicz, and Palumbo could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**3.     The Fraudulent EMG Tests**

248.     EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

249.     There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

250.     The Defendants did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentation.

251.     According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

252.     Even if there were any need for any of the EMG tests that the Defendants purported to provide, the nature and number of the EMGs that the Defendants purported to provide frequently

grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

253.    For example:

(i)      On July 17, 2015, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide a two-limb EMG to an Insured named JH, and on August 21, 2015, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide another two-limb EMG to JH, supposedly to determine whether JH suffered from a radiculopathy.

(ii)     On May 13, 2016, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide a four-limb EMG to an Insured named ND, supposedly to determine whether ND suffered from a radiculopathy.

(iii)    On July 19, 2017, JKC Pain and Chang purported to provide a three-limb EMG to an Insured named SG, supposedly to determine whether SG suffered from a radiculopathy.

(iv)     On June 29, 2018, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide a two-limb EMG to an Insured named MK, and on July 13, 2018, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide another two-limb EMG to MK, supposedly to determine whether MK suffered from a radiculopathy.

(v)      On April 29, 2019, JKC Pain and Chang purported to provide a four-limb EMG to an Insured named EM, supposedly to determine whether LR suffered from a radiculopathy.

(vi)     On May 8, 2019, Chang PC and Chang purported to provide a four-limb EMG to an Insured named BA, supposedly to determine whether BA suffered from a radiculopathy.

(vii)    On May 17, 2019, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide a two-limb EMG to an Insured named OK, and on May 31, 2019, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide another two-limb EMG to OK, supposedly to determine whether OK suffered from a radiculopathy.

(viii)   On August 10, 2019, JKC Pain and Chang purported to provide a four-limb EMG to an Insured named HJ, supposedly to determine whether HJ suffered from a radiculopathy.

(ix)     On August 30, 2019, JKC Pain and Chang purported to provide a three-limb EMG to an Insured named MZ, supposedly to determine whether MZ suffered from a

radiculopathy.

(x)     On October 30, 2019, Chang PC and Chang purported to provide a three-limb EMG to an Insured named FS, supposedly to determine whether FS suffered from a radiculopathy.

(xi)    On February 21, 2020, Chang PC and Chang purported to provide a four-limb EMG to an Insured named TD, supposedly to determine whether TD suffered from a radiculopathy.

(xii)   On May 1, 2020, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide a two-limb EMG to an Insured named AR, and on May 29, 2020, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide another two-limb EMG to AR, supposedly to determine whether AR suffered from a radiculopathy.

(xiii)  On November 10, 2020, Chang PC and Chang purported to provide a one-limb EMG to an Insured named LS, and on November 14, 2020, Chang PC and Chang purported to provide another two-limb EMG to LS, supposedly to determine whether LS suffered from a radiculopathy.

(xiv)   On January 19, 2021, Chang PC and Chang purported to provide a four-limb EMG to an Insured named LR, supposedly to determine whether LR suffered from a radiculopathy.

(xv)    On January 12, 2022, Chang PC and Chang purported to provide a two-limb EMG to an Insured named JG, and on February 25, 2022, Chang PC and Chang purported to provide another two-limb EMG to JG, supposedly to determine whether JG suffered from a radiculopathy.

254.    These are only representative examples. In the substantial majority of the EMG claims identified in Exhibits "1" – "3", the Defendants purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

**4.      The Concealment of Excessive and Unnecessary EDX Testing**

255.    Not only did the Defendants routinely bill for an excessive and medically unnecessary number of EDX tests, but the Defendants also routinely acted to conceal the excessive number of EDX tests that they purported to provide.

256.    EDX tests, and particularly EMG tests, are uncomfortable for most patients, and even painful. As a result, there generally is no legitimate reason why a patient should be subjected to multiple rounds of EDX tests within a short period of time.

257.    Rather, to the extent that a patient requires EDX tests in the first instance, the EDX tests generally should be performed, collectively, on a single date.

258.    However, to conceal the excessive number of EDX tests they purported to provide to Insureds, the Defendants routinely and unnecessarily purported to provide EDX tests to Insureds on to two separate dates of service, and then split the EDX test charges onto two separate bills.

259.    For example:

(i)     APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named JH over the course of two separate dates of service – July 17, 2015 and August 21, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ii)    APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named MK over the course of two separate dates of service – June 29, 2018 and July 13, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iii)   APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named HR over the course of two separate dates of service – January 18, 2019 and February 2, 2019 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iv)    APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named OK over the course of two separate dates of service – May 17, 2019 and May 31, 2019 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(v)     APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named AR over the course of two separate dates of service – May 1, 2020 and May 29, 2020 – and then split the charges for the NCV and EMG tests onto two separate bills in

order to conceal the excessive, medically unnecessary testing.

(vi)     Chang PC and Chang purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named LS over the course of two separate dates of service – November 10, 2020 and November 14, 2020 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vii)    Chang PC and Chang purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named HA over the course of two separate dates of service – December 9, 2020 and December 18, 2020 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(viii)   Chang PC and Chang purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named HA over the course of two separate dates of service – September 17, 2021 and September 24, 2021  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ix)     Chang PC and Chang purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named AG over the course of two separate dates of service – September 29, 2021 and October 15, 2021 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(x)      Chang PC and Chang purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named JG over the course of two separate dates of service – January 12, 2022 and February 25, 2022 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

260.    These are only representative examples. In the claims for EDX tests identified in Exhibits "1" and "3", the Defendants routinely and unnecessarily purported to subject the Insureds to EDX tests on separate dates of service, and split the EDX test charges onto separate bills, to conceal the fact that they were purporting to provide an excessive and unnecessary number of EDX tests to the Insureds.

5.       **The Fraudulent Radiculopathy Diagnoses**

261.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

262.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Defendants purported to treat.

263.    As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

264.    As set forth above, the substantial majority of the Insureds whom the Defendants purportedly treated did not suffer any serious medical problems as the result of any automobile accident, much less any radiculopathies.

265.    Even so, in the EMG and NCV claims identified in Exhibits "1" – "3", the Defendants purported to identify radiculopathies in the substantial majority of the Insureds to whom they purported to provide EMG and NCV testing.

266.    The Defendants purported to arrive at their pre-determined radiculopathy "diagnoses" in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide.

**F.      The Fraudulent Charges for Pain Management Injections by JKC Pain, Chang PC, and Chang**

267.     As set forth in Exhibits "2" and "3", pursuant to the Defendants' unlawful referral scheme, and based upon the phony, boilerplate "diagnoses" that the Defendants provided during their fraudulent examinations and EDX tests, JKC Pain, Chang PC, and Chang purported to subject many Insureds to a series of medically unnecessary pain management injections, including but not limited to epidural steroid injections and facet injections, often purportedly performed under fluoroscopic guidance or with epidurography.

268.     Chang purported to personally administer virtually all of the pain management injections in the claims identified in Exhibits "2" and "3".

269.     As set forth in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang then billed the pain management injections to GEICO under CPT codes 62273, 62290, 62291, 62310, 62311, 62318, 62318, 62319, 62321, 62323, 62327, 64484, 64490, 64491, 64492, 64493, 64494, 64495, 64633, 64634, 64635, 64636, typically resulting in thousands of dollars in PIP charges per Insured.

270.     Like the charges for the other Fraudulent Services, the charges for the pain management injections identified in Exhibits "2" and "3" were fraudulent in that the injections were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the Defendants' unlawful referral scheme, and the phony, boilerplate "diagnoses" that the Defendants provided to the Insureds at the conclusion of the putative examinations.

271.     Moreover, in the claims for pain management injections identified in Exhibits "2" and "3", the charges for the pain management injections were fraudulent in that they misrepresented JKC Pain, Chang PC, and Chang's eligibility to collect PIP Benefits in the first instance.

272.     As set forth above JKC Pain, Chang PC, and Chang never were eligible to collect

PIP Benefits in connection with the claims identified in Exhibits "2" and "3", because – as a result of the fraudulent and unlawful scheme described herein – neither they nor the injections were in compliance with all significant laws and regulations governing health care practice in New York and New Jersey.

**1.     Basic, Legitimate Use of Pain Management Injections**

273.     Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

274.     If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

275.     The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

**2.     The Medically Unnecessary Pain Management Injections**

276.     As set forth above, virtually all of the Insureds in the claims identified in Exhibits "2" and "3" were involved in relatively minor accidents.

277.     To the limited extent that the Insureds in the claims identified in Exhibits "2" and "3" experienced any injuries at all in their minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

278.     By the time the Insureds in the claims identified in Exhibits "2" and "3" presented to JKC Pain, Chang PC, and Chang for treatment, they either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

279.   Even so, in the claims for pain management injections identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely provided pain management injections to Insureds who did not have any serious symptoms secondary to any automobile accident that legitimately would warrant the injections.

280.   For example:

(i)   On April 10, 2017, an Insured named HC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HC's vehicle was drivable following the accident. The police report further indicated that HC was not injured and did not complain of any pain. In keeping with the fact that HC was not seriously injured, HC did not visit any hospital emergency room immediately following the accident. To the extent that HC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, JKC Pain and Chang purported to provide HC with a medically unnecessary epidural steroid injection on June 15, 2017, and additional epidural steroid injections on August 17, 2017, December 7, 2017, and September 20, 2018. The medically unnecessary injections were administered over twenty-nine months after HC's accident, long after any legitimate symptoms HC may have experienced as the result of the accident had resolved.

(ii)   On September 13, 2017, an Insured named ZB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZB's vehicle was drivable following the accident. The police report further indicated that ZB was not injured and did not complain of any pain. In keeping with the fact that ZB was not seriously injured, ZB did not visit any hospital emergency room immediately following the accident. Rather, one day after the accident, ZB presented to CITYMD urgent care were he was briefly observed and diagnosed with nothing more serious than minor strain or strain injuries. To the extent that ZB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, JKC Pain and Chang purported to provide ZB with a medically unnecessary epidural steroid injection on April 5, 2018, and an additional epidural steroid injection on June 5, 2018. The medically unnecessary injections were administered nearly nine months after ZB's accident, long after any legitimate symptoms ZB may have experienced as the result of the accident had resolved.

(iii)   On December 31, 2017, an Insured named AA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the

accident. The police report further indicated that AA was not injured and did not complain of any pain. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room immediately following the accident. To the extent that AA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, JKC Pain and Chang purported to provide AA with a medically unnecessary epidural steroid injection on July 12, 2018, and additional epidural steroid injections on August 9, 2018, January 24, 2019, and March 28, 2019, as well as an additional medically unnecessary facet injection on September 25, 2019. The medically unnecessary injections were administered nearly twenty-one months after AA's accident, long after any legitimate symptoms AA may have experienced as the result of the accident had resolved.

(iv)     On July 10, 2018, an Insured named HI was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HI's vehicle was drivable following the accident. The police report further indicated that HI was not injured and did not complain of any pain. Nonetheless HI self-presented to HMH Palisades Medical Center where he was observed on an outpatient basis and released shortly thereafter with nothing more serious than a minor soft tissue sprain/strain diagnosis. To the extent that HI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, JKC Pain and Chang purported to provide HI with a medically unnecessary epidural steroid injection on June 20, 2019, and an additional epidural steroid injection on August 20, 2019. The medically unnecessary injections were administered over thirteen months after HI's accident, long after any legitimate symptoms HI may have experienced as the result of the accident had resolved.

(v)      On July 10, 2018, an Insured named HI was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HI's vehicle was drivable following the accident. The police report further indicated that HI was not injured and did not complain of any pain. Nonetheless HI self-presented to HMH Palisades Medical Center where he was observed on an outpatient basis and released shortly thereafter with nothing more serious than a minor soft tissue sprain/strain diagnosis. To the extent that HI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Chang PC and Chang purported to provide HI with a medically unnecessary epidural steroid injection on October 1, 2019. The medically unnecessary injection was administered over fourteen months after HI's accident, long after any legitimate symptoms HI may have experienced as the result of the accident had resolved.

(vi)    On September 16, 2018, an Insured named GB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GB's vehicle was drivable following the accident. The police report further indicated that GB was not seriously injured. In keeping with the fact that GB was not seriously injured, GB did not visit any hospital emergency room immediately following the accident. To the extent that GB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Chang PC and Chang purported to provide GB with a medically unnecessary epidural steroid injections on September 17, 2019. The medically unnecessary injection was administered nearly nine months after GB's accident, long after any legitimate symptoms GB may have experienced as the result of the accident had resolved.

(vii)   On February 25, 2019, an Insured named HJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HJ's vehicle was drivable following the accident. The police report further indicated that HJ was not injured and did not complain of any pain. In keeping with the fact that HJ was not seriously injured, HJ did not visit any hospital emergency room immediately following the accident. To the extent that HJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, JKC Pain and Chang purported to provide HJ with a medically unnecessary epidural steroid injections on November 23, 2019. The medically unnecessary injection was administered nearly nine months after HJ's accident, long after any legitimate symptoms HJ may have experienced as the result of the accident had resolved.

(viii)  On February 25, 2019, an Insured named HJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HJ's vehicle was drivable following the accident. The police report further indicated that HJ was not injured and did not complain of any pain. In keeping with the fact that HJ was not seriously injured, HJ did not visit any hospital emergency room immediately following the accident. To the extent that HJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Chang PC and Chang purported to provide HJ with a medically unnecessary epidural steroid injections on November 23, 2019. The medically unnecessary injection was administered nearly nine months after HJ's accident, long after any legitimate symptoms HJ may have experienced as the result of the accident had resolved.

(ix)    On June 21, 2019, an Insured named MZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MZ's vehicle was drivable following the accident. The police report further indicated that MZ was not seriously injured.

Nonetheless MZ presented to Jersey City Medical Center where he was observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that MZ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, JKC Pain and Chang purported to provide MZ with a medically unnecessary epidural steroid injections on September 17, 2019. The medically unnecessary injection was administered nearly three months after MZ's accident, long after any legitimate symptoms MZ may have experienced as the result of the accident had resolved.

(x)   On July 28, 2019, an Insured named MB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room immediately following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Chang PC and Chang purported to provide MB with a medically unnecessary epidural steroid injection on December 17, 2019, and additional epidural steroid injections on March 10, 2020 and July 9, 2020. The medically unnecessary injections were administered over twenty-nine months after MB's accident, long after any legitimate symptoms MB may have experienced as the result of the accident had resolved.

281.   These are only representative examples. In the claims for pain management injections identified in Exhibits "2" and "3", JKC Pain, Chang PC, and Chang routinely purported to provide medically unnecessary pain management injections to Insureds, despite the fact that the Insureds had not suffered any injuries in their accidents that would warrant the injections.

282.   JKC Pain, Chang PC, and Chang's pre-determined treatment protocol, including subjecting patients to medically unwarranted pain management injections, was designed and employed by JKC Pain, Chang PC, and Chang solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the injections.

### G.    Chang's Unlawful Self Referrals for Pain Management Injections

283.    Not only did JKC Pain, Chang PC, and Chang fraudulently submit inflated charges for medically unnecessary services, but many of JKC Pain, Chang PC, and Chang's charges were the product of illegal self-referrals from Chang to JKC Pain, Chang PC, as well as Union ASC, an ambulatory surgery center which Chang owned in part.

284.    As set forth above, the Codey Law provides – in substance – that a "practitioner" may not refer a patient to a "health care service" in which the practitioner has a "significant beneficial interest". See N.J.S.A. 45:9-22.5.

285.    However – and again, as set forth above – the Codey Law's restrictions on patient referrals do not apply to:

> medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office ….

See id.

286.    What is more, pursuant to the ASC Exception described above, the Codey Law's restrictions on patient referrals also do not apply to "ambulatory surgery or procedures requiring [or involving the use of] anesthesia performed at … an ambulatory care facility licensed by the Department of Health to perform surgical and related services", provided that – among other things – the practitioner who provided the referral "personally performs the procedure". See id.

287.    In the context of the Codey Law, Chang – who is a licensed physician – was a "practitioner[]". See N.J.S.A. 45:9-22.4.

288.    In the context of the Codey Law, JKC Pain, Chang PC, and Union ASC were "health care services", in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction …." Id.

289.    In the context of the Codey Law, Chang – who owned JKC Pain and Chang PC, and had an ownership interest in Union ASC – had a "significant beneficial interest" in all three of JKC Pain, Chang PC, and Union ASC. Id.

290.    In the context of the Codey Law, Union ASC was an "ambulatory care facility licensed by the Department of Health to perform surgical and related services".

291.    Additionally, as set forth above, New York law prohibits licensed health care service providers, including physicians, from referring patients to health care practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

292.    In the context of the New York Public Health Law, Chang – who owned JKC Pain and Chang PC, and had an ownership interest in Union ASC – had an "ownership or investment interest" in all three of JKC Pain, Chang PC, and Union ASC. Id.

293.    Further, in the context of the New York Public Health Law, JKC Pain, Chang PC, and Union ASC were "health care practices." Id.

**1.    The Illegal Self-Referrals for Pain Management Injections**

294.    Notwithstanding his respective significant beneficial/ownership interests in JKC Pain, Chang PC, and Union ASC, Chang routinely self-referred – or directed his employees to self-refer – Insureds to JKC Pain, Chang PC, and Union ASC for medically unnecessary pain management injections.

295.    These self-referrals violated the Codey Law, inasmuch as none of the exceptions to the Codey Law applied to these self-referrals.

296.    The exception in the Codey Law, for "medical treatment or a procedure that is provided at the practitioner's medical office", did not apply to the self-referrals for these injections because – as set forth above – virtually all of the pain management injections billed through JKC Pain and Chang PC in the claims identified in Exhibit "2" and "3" purportedly were performed at ambulatory surgery centers, which in most cases were located in New Jersey, including Union ASC in Union, New Jersey. These ambulatory surgery centers were not Chang's medical office.

297.    Nor did the ASC Exception apply to these self-referrals, because the pain management injections did not legitimately qualify as ambulatory surgery or procedures requiring or involving the use of anesthesia. To the contrary, all of the anesthesia services attendant to JKC Pain and Chang PC's pain management injections -- i.e., sedation -- were medically unnecessary.

298.    For example, in a legitimate clinical setting, pain management injections such as epidural injections and facet joint injections generally do not require anesthesia.

299.    Indeed, according to a review of the literature published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures." See Smith, Howard, M.D., Evaluation of Intravenous Sedation on Diagnostic Spinal Injection Procedures, Pain Physician 2013.

300.    Along similar lines, the American Society of Anesthesiologists has specified that "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, and occipital nerve block and facet joint injections." See American Society of Anesthesiologists,

"Statement on Anesthetic Care during Interventional Pain Procedures for Adults", October 20, 2010.

301.    Sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

302.    Not only can sedation itself induce adverse events, including death, but patients receiving pain management injections should remain awake and alert to warn the treating physician of adverse events relating to the underlying injections.

303.    These self-referrals also violated the Codey Law and New York Public Health Law, inasmuch as none of the applicable disclosure requirements were made to the Insureds who were subject to these self-referrals.

304.    Chang did not disclose his ownership interest in Union ASC when referring the Insureds to receive pain management injections which were performed at Union ASC.

305.    Nor did Chang inform the Insureds of his or her "right to utilize a specifically identified alternative health care provider…" which most certainly was available.

306.    For example, the majority of the Insureds referred from to Union ASC in the claims identified in Exhibits "2" and "3" resided and worked in New York, a substantial distance away from Union ASC, which was the location at which many of the pain management injections were purportedly performed.

307.    There was no legitimate reason why Insureds who resided in New York would require pain management referrals to a facility such as Union ASC, which was inconveniently located far from the Insureds' homes and workplaces.

308.    In fact, there were numerous pain management practices and surgery centers located in New York, which were much closer to the Insureds' homes, and which were far more established and reputable than Union ASC.

309.    Nonetheless, Chang routinely referred GEICO New York Insureds to Union ASC to receive pain management injections.

310.    For example:

(i)     On or about March 2, 2017, Chang purported to conduct a follow-up examination of an Insured named SC at JKC Pain. Billing for SC's examination was submitted to GEICO through JKC Pain. At the conclusion of SC's examination, Chang self–referred SC to JKC Pain and Union ASC for epidural steroid injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on March 21, 2017, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or JKC Pain's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or JKC Pain's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, JKC Pain and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(ii)    On or about April 3, 2018, Chang purported to conduct a follow-up examination of an Insured named JF at JKC Pain. Billing for JF's examination was submitted to GEICO through JKC Pain. At the conclusion of JF's examination, Chang self–referred JF to JKC Pain and Union ASC for epidural steroid injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on April 19, 2018, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or JKC Pain's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or JKC Pain's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically

identified alternative health care provider…." Even so, JKC Pain and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(iii)     On or about September 26, 2017, Chang purported to conduct an initial examination of an Insured named SS at JKC Pain. Billing for SS's examination was submitted to GEICO through JKC Pain. At the conclusion of SS's examination, Chang self–referred SS to JKC Pain and Union ASC for epidural steroid injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on October 19, 2017, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or JKC Pain's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or JKC Pain's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, JKC Pain and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(iv)     On or about February 19, 2019, Chang purported to conduct a follow-up examination of an Insured named JV at JKC Pain. Billing for JV's examination was submitted to GEICO through JKC Pain. At the conclusion of JV's examination, Chang self–referred JV to JKC Pain and Union ASC for facet injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on March 7, 2019, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or JKC Pain's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or JKC Pain's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, JKC Pain and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(v)     On or about July 9, 2019, Chang purported to conduct a follow-up examination of an Insured named OK at JKC Pain. Billing for OK's examination was submitted to GEICO through JKC Pain. At the conclusion of OK's examination, Chang self–referred OK to JKC Pain and Union ASC for epidural steroid injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on July 30, 2019, at Union ASC, an

ambulatory surgery center which Chang owned in part, rather than at Chang or JKC Pain's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or JKC Pain's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, JKC Pain and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(vi)    On or about July 9, 2019, Chang purported to conduct a follow-up examination of an Insured named YC at Chang PC. Billing for YC's examination was submitted to GEICO through Chang PC. At the conclusion of YC's examination, Chang self–referred YC to Chang PC and Union ASC for epidural steroid injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on January 28, 2020, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or Chang PC's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or Chang PC's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, Chang PC and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(vii)    On or about July 23, 2019, Chang purported to conduct a follow-up examination of an Insured named OK at Chang PC. Billing for OK's examination was submitted to GEICO through Chang PC. At the conclusion of OK's examination, Chang self–referred OK to Chang PC and Union ASC for epidural steroid injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on July 30, 2019, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or Chang PC's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or Chang PC's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to

utilize a specifically identified alternative health care provider…." Even so, Chang PC and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(viii)   On or about October 2, 2019, Chang purported to conduct a follow-up examination of an Insured named JR at Chang PC. Billing for JR's examination was submitted to GEICO through Chang PC. At the conclusion of JR's examination, Chang self–referred JR to Chang PC and Union ASC for epidural steroid injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on October 15, 2019, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or Chang PC's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or Chang PC's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, Chang PC and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(ix)   On or about October 28, 2019, Chang purported to conduct a follow-up examination of an Insured named ZB at Chang PC. Billing for ZB's examination was submitted to GEICO through Chang PC. At the conclusion of ZB's examination, Chang self–referred ZB to Chang PC and Union ASC for epidural steroid injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on November 19, 2019, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or Chang PC's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or Chang PC's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, Chang PC and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

(x)   On or about January 21, 2020, Chang purported to conduct a follow-up examination of an Insured named JV at Chang PC. Billing for JV's examination was submitted to GEICO through Chang PC. At the conclusion of JV's examination, Chang self–referred JV to Chang PC and Union ASC for epidural steroid injections that did not

legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Chang on January 28, 2020, at Union ASC, an ambulatory surgery center which Chang owned in part, rather than at Chang or Chang PC's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Union ASC, rather than at Chang or Chang PC's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Chang never disclosed his ownership interest in Union ASC to the Insureds, nor did Chang inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, Chang PC and Chang billed GEICO for the injections, which were the product of an unlawful self–referral.

311.    These are only representative examples of JKC Pain, Chang PC, Union ASC, and Chang's illegal self-referrals for pain management injections. The pain management injections, as well as the surgical facility fees attendant to them, in the claims identified in Exhibits "2" – "3" were routinely the product of illegal self-referrals, inasmuch as none of the referrals qualified for the ASC Exception or any other exception to the Codey Law, nor were any of the disclosures required by New York Public Health Law 238-D satisfied.

312.    Following all of these self-referrals, GEICO received two separate bills from Chang and his entities: a bill from JKC Pain or Chang PC for the pain management injections themselves and a bill for a facility fee from the ambulatory surgery center – often Union ASC – where the injections were provided.

## H.    The Fraudulent Charges for Chiropractic and Physical Therapy Services by APJ Chiro

313.    As set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any health care problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

314.    The vast majority of soft tissue injuries such as sprains and strains resolve after a

short course of conservative treatment, or no treatment at all.

315.    Accordingly, APJ Chiro, Abrams, Piazza, and Julewicz knew that – unless they could create a false basis to provide long-term, medically unnecessary chiropractic, physical therapy, and acupuncture services to the Insureds in the claims identified in Exhibit "1" their ability to provide such long-term, medically unnecessary chiropractic and physical therapy services would be limited, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic and/or physical therapy services beyond an initial short course of conservative treatment.

316.    Accordingly, and as set forth above, APJ Chiro, Abrams, Piazza, and Julewicz entered into a secret agreement with JKC Pain, Chang PC, and Chang, whereby:

(i)     APJ Chiro, Abrams, Piazza, and Julewicz would cause Insureds to be referred to JKC Pain, Chang PC, and Chang for expensive and medically unnecessary/excessive examinations and EDX tests despite the Insureds' lack of any genuine presenting problems that would warrant those services; and

(ii)    as compensation for the medically unnecessary referrals, JKC Pain, Chang PC, and Chang would – among other things – cause the Insureds to be falsely diagnosed with continuing pain and related symptoms, to provide a false justification for the medically unnecessary chiropractic and physical therapy services that APJ Chiro, Abrams, Piazza, and Julewicz already had provided, and a false justification to refer the Insureds back to APJ Chiro, Abrams, Piazza, and Julewicz for many more weeks or months of continued, medically unnecessary chiropractic and/or physical therapy services.

317.    As set forth above, in keeping with the fact that the return referrals from JKC Pain, Chang PC, and Chang to APJ Chiro, Abrams, Piazza, and Julewicz were not predicated on medical necessity, and instead were illegal compensation for the initial referrals, the Defendants' own records indicated that the APJ Chiro, Abrams, Piazza, and Julewicz's prior chiropractic and physical therapy services had not been effective in treating the Insureds' supposed complaints.

318.    Even so, in the claims identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and

Julewicz routinely used the return referrals from JKC Pain, Chang PC, and Chang as a false basis to bill GEICO for months of medically unnecessary chiropractic and/or physical therapy services.

319.    APJ Chiro, Abrams, Piazza, and Julewicz typically billed the putative chiropractic and physical therapy services to GEICO under CPT codes 97010, 97012, 97014, 97020, 97035, 97110, 97124, 97140, 97750, 97760, 98940, 98941.

320.    Like the charges for the other Fraudulent Services, the charges for the chiropractic/physical therapy services were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit to GEICO, not to treat or otherwise benefit the Insureds who were subjected to them.

321.    Further, in the claims for chiropractic and physical therapy services identified in Exhibit "1", the charges for the chiropractic and physical therapy services were fraudulent in that they misrepresented APJ Chiro's eligibility to collect PIP Benefits in the first instance.

322.    In fact, APJ Chiro was never eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because, as a result of the fraudulent and unlawful scheme described herein, neither APJ Chiro nor the treatments were in compliance with relevant laws and regulations governing health care practice or licensing laws in New York and New Jersey.

323.    What is more, and as set forth above, many of the Insureds in the claims identified in Exhibit "1" were involved in relatively minor accidents, thus, to the extent that the Insureds suffered any health care problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

324.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all.

325.     Nonetheless, in many of the claims for chiropractic and physical therapy treatments identified in Exhibit "1", APJ Chiro routinely purported to provide medically unnecessary chiropractic and physical therapy treatments to Insureds who had been involved in relatively minor automobile accidents – and who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury – for months after the underlying accidents, and long after any attendant soft tissue pain or other symptoms attendant to the automobile accidents would have resolved.

326.     For example:

(i)     On January 7, 2016, an Insured named EX was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EX's vehicle was drivable following the accident. The police report further indicated that EX was not injured and did not complain of any pain. Nonetheless, following the accident EX drove herself to Staten Island University Hospital South. The contemporaneous hospital records indicate that EX was briefly observed on an outpatient basis and discharged with no serious injury diagnosis. To the extent that EX experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require over nine months of chiropractic and physical therapy services. Even so, between January 2016 and November 2016, APJ Chiro, Abrams, Piazza, and Julewicz purported to provide EX with over nine months of purported chiropractic and physical therapy "treatment" at APJ Chiro.

(ii)    On November 10, 2019, an Insured named TM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TF's vehicle was drivable following the accident. The police report further indicated that TF was not injured and did not complain of any pain. In keeping with the fact that TF was not seriously injured, TF did not visit any hospital emergency room following the accident. To the extent that TF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require over seven months of chiropractic and physical therapy services. Even so, between November 2019 and June 2020, APJ Chiro, Abrams, Piazza, and Julewicz purported to provide TF with over seven months of purported chiropractic and physical therapy "treatment" at APJ Chiro.

(iii)   On November 19, 2019, an Insured named DF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DF's vehicle was drivable following the accident. The police report further indicated that DF was not injured and did not complain of any pain. In keeping with the fact that DF was not seriously injured,

DF did not visit any hospital emergency room following the accident. To the extent that DF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require over one year of chiropractic and physical therapy services. Even so, between November 2019 and December 2020, APJ Chiro, Abrams, Piazza, and Julewicz purported to provide DF with over one year of purported chiropractic and physical therapy "treatment" at APJ Chiro.

(iv)    On November 19, 2019, an Insured named AA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require over ten months of chiropractic and physical therapy services. Even so, between December 2019 and November 2020, APJ Chiro, Abrams, Piazza, and Julewicz purported to provide AA with over ten months of purported chiropractic and physical therapy "treatment" at APJ Chiro.

(v)    On May 4, 2021, an Insured named TF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TF's vehicle was drivable following the accident. The police report further indicated that TF was not injured and did not complain of any pain. In keeping with the fact that TF was not seriously injured, TF did not visit any hospital emergency room following the accident. To the extent that TF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require over seventeen months of chiropractic and physical therapy services. Even so, between May 2021 and October 2022, APJ Chiro, Abrams, Piazza, and Julewicz purported to provide TF with over seventeen months of purported chiropractic and physical therapy "treatment" at APJ Chiro.

327.    These are only representative examples. In the claims that are identified in Exhibit "1", APJ Chiro, Abrams, Piazza, and Julewicz frequently recommended and purported to provide medically unnecessary chiropractic and physical therapy treatment to Insureds who had been involved in relatively minor accidents – and who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury – for months after the underlying accidents, and long

after any attendant soft tissue pain or other symptoms attendant to the automobile accidents would have resolved.

## III.   The Fraudulent Billing Submitted to GEICO

328.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA–1500 forms and treatment reports through APJ Chiro, JKC Pain, and Chang PC containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

329.    The HCFA–1500 forms and treatment reports were false and misleading in the following material respects:

(i)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all significant statutory and regulatory requirements governing health care practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were not eligible to receive PIP reimbursement because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) the Defendants engaged in an unlawful self-referral scheme; (c) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (d) in the case of JKC Pain, because it operated unlawfully as a medical practice in New York.

(ii)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were not eligible for PIP reimbursement, because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) the Defendants engaged in an unlawful self-referral scheme; (c) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (d) in the case of JKC Pain, because it operated unlawfully as a medical practice in New York.

(iii)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

330.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

331.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

332.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

333.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently were never performed in the first instance.

334.     In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to an illegal referral scheme.

335.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitrations against GEICO and other insurers if the charges were not promptly paid in full.

336.     GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,600,000.00.

337.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against APJ Chiro, JKC Pain, and Chang PC
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

338.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

339.     There is an actual case in controversy between GEICO and APJ Chiro, JKC Pain, and Chang PC regarding more than $75,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO through APJ Chiro, JKC Pain, and Chang PC.

340. APJ Chiro, JKC Pain, and Chang PC have no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful activities described herein.

341. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that APJ Chiro, JKC Pain, and Chang PC have no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Abrams, Piazza, and Julewicz**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

342. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

343. APJ Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

344. Abrams, Piazza, and Julewicz knowingly conducted and/or participated, directly or indirectly, in the conduct of APJ Chiro's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that APJ Chiro was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; (iv) the billed-for services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that

could be submitted; and (vi) neither APJ Chiro nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

345.    APJ Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Abrams, Piazza, and Julewicz have operated APJ Chiro, inasmuch as APJ Chiro is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for APJ Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Abrams, Piazza, and Julewicz continue to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through APJ Chiro to the present day.

346.    APJ Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by APJ Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

347.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,185,000.00 pursuant to the fraudulent bills submitted through APJ Chiro.

348.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Abrams, Piazza, Julewicz, Palumbo, JKC Pain, Chang PC, and Chang**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

349.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

350.     APJ Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

351.     Abrams, Piazza, Julewicz, Palumbo, JKC Pain, Chang PC, and Chang are employed by and/or associated with the APJ Chiro enterprise.

352.     Abrams, Piazza, Julewicz, Palumbo, JKC Pain, Chang PC, and Chang knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the APJ Chiro enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than five years seeking payments that APJ Chiro was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; (iv) the billed-for services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) neither APJ Chiro nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint

are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

353.    Abrams, Piazza, Julewicz, Palumbo, JKC Pain, Chang PC, and Chang knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

354.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,185,000.00 pursuant to the fraudulent bills submitted through APJ Chiro.

355.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo
### (Common Law Fraud)

356.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

357.    APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

358.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1" the representation that APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo were in compliance with all significant laws and

regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

359.   APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through APJ Chiro that were not compensable.

360.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,185,000.00 pursuant to the fraudulent bills submitted by the Defendants through APJ Chiro.

361.   APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

362.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against JKC Pain, Chang PC, and Chang
### (Aiding and Abetting Fraud)

363.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

364.     JKC Pain, Chang PC, and Chang knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo.

365.     The acts of JKC Pain, Chang PC, and Chang in furtherance of the fraudulent scheme involve referring Insureds to APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo for medically unnecessary services in exchange for unlawful compensation from APJ Chiro, Abrams, Piazza, and Julewicz.

366.     The conduct of JKC Pain, Chang PC, and Chang was significant and material. The conduct of JKC Pain, Chang PC, and Chang was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo to obtain payment from GEICO and from other insurers.

367.     JKC Pain, Chang PC, and Chang aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to APJ Chiro for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

368.    The conduct of JKC Pain, Chang PC, and Chang caused GEICO to pay more than $1,185,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through APJ Chiro.

369.    JKC Pain, Chang PC, and Chang's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

370.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against APJ Chiro, Abrams, Piazza, Palumbo, and Julewicz**
**(Unjust Enrichment)**

371.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

372.    As set forth above, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

373.    When GEICO paid the bills and charges submitted or caused to be submitted by Abrams, Piazza, and Julewicz through APJ Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

374.    APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

375.    APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

376.    By reason of the above, APJ Chiro, Abrams, Piazza, Julewicz, and Palumbo have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,185,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Chang**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

377.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

378.    JKC Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

379.    Chang knowingly conducted and/or participated, directly or indirectly, in the conduct of JKC Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that JKC Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither JKC Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

380.    JKC Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Chang has operated JKC Pain, inasmuch as JKC Pain is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for JKC Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Chang continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through JKC Pain to the present day.

381.    JKC Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by JKC Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

382.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $290,000.00 pursuant to the fraudulent bills submitted through JKC Pain.

383.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**Against Chang, APJ Chiro, Abrams, Piazza, and Julewicz**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

384.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

385.    JKC Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

386.    Chang, APJ Chiro, Abrams, Piazza, and Julewicz are employed by and/or associated with the JKC Pain enterprise.

387.    Chang, APJ Chiro, Abrams, Piazza, and Julewicz knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the JKC Pain enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than five years seeking payments that JKC Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither JKC Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

388.    Chang, APJ Chiro, Abrams, Piazza, and Julewicz knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

389.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $290,000.00 pursuant to the fraudulent bills submitted through JKC Pain.

390.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against JKC Pain and Chang**
**(Common Law Fraud)**

391.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

392.    JKC Pain and Chang intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

393.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2" the representation that JKC Pain and Chang were in compliance with all significant laws and regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation that JKC Pain and Chang were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "2", concealment of the Defendants' illegal self-referral scheme; (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and

were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich JKC Pain and Chang, not to benefit the Insureds who supposedly were subjected to them; and (vi) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

394.    JKC Pain and Chang intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through JKC Pain that were not compensable.

395.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $290,000.00 pursuant to the fraudulent bills submitted by the Defendants through JKC Pain.

396.    JKC Pain and Chang's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

397.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against APJ Chiro, Abrams, Piazza, Julewicz**
**(Aiding and Abetting Fraud)**

398.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

399.     APJ Chiro, Abrams, Piazza, Julewicz knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by JKC Pain and Chang.

400.     The acts of APJ Chiro, Abrams, Piazza, Julewicz in furtherance of the fraudulent scheme involved referring Insureds from APJ Chiro to JKC Pain for medically unnecessary services.

401.     The conduct of APJ Chiro, Abrams, Piazza, Julewicz was significant and material. The conduct of APJ Chiro, Abrams, Piazza, Julewicz was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for JKC Pain and Chang to obtain payment from GEICO and from other insurers.

402.     APJ Chiro, Abrams, Piazza, Julewicz aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to JKC Pain for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

403.     The conduct APJ Chiro, Abrams, Piazza, Julewicz caused GEICO to pay more than $290,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through JKC Pain.

404.     APJ Chiro, Abrams, Piazza, Julewicz's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

405.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against JKC Pain and Chang**
**(Unjust Enrichment)**

406.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

407.     As set forth above, JKC Pain and Chang have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

408.     When GEICO paid the bills and charges submitted or caused to be submitted by Chang through JKC Pain for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

409.     JKC Pain and Chang have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

410.     JKC Pain and Chang's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

411.     By reason of the above, JKC Pain and Chang have been unjustly enriched in an amount to be determined at trial, but in no event less than $290,000.00.

**TWELFTH CAUSE OF ACTION**
**Against Chang**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

412.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

413.     Chang PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Chang knowingly conducted and/or participated, directly or indirectly, in the conduct of Chang PC's affairs through a pattern of

racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Chang PC was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither Chang PC nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

414.    Chang PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Chang has operated Chang PC, inasmuch as Chang PC is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Chang PC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Chang continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Chang PC to the present day.

415.    Chang PC is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Chang PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

416.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted through Chang PC.

417.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Chang, APJ Chiro, Abrams, Piazza, and Julewicz
### (Violation of RICO, 18 U.S.C. § 1962(d))

418.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

419.    Chang PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

420.    Chang, APJ Chiro, Abrams, Piazza, and Julewicz are employed by and/or associated with the Chang PC enterprise.

421.    Chang, APJ Chiro, Abrams, Piazza, and Julewicz knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Chang PC enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking payments that Chang PC was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral

130

scheme; and (iv) neither Chang PC nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

422.    Chang, APJ Chiro, Abrams, Piazza, and Julewicz knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

423.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted through Chang PC.

424.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION**
**Against Chang PC and Chang**
**(Common Law Fraud)**

425.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

426.    Chang PC and Chang intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

427.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "3" the representation that Chang PC

and Chang were in compliance with all significant laws and regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "3", the representation that Chang PC and Chang were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "3", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "3", concealment of the Defendants' illegal self-referral scheme; (v) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Chang PC and Chang, not to benefit the Insureds who supposedly were subjected to them; and (vi) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

428.   Chang PC and Chang intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Chang PC that were not compensable under New York and New Jersey's No-Fault Laws.

429.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted by the Defendants through Chang PC.

430.    Chang PC and Chang's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

431.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against APJ Chiro, Abrams, Piazza, and Julewicz**
**(Aiding and Abetting Fraud)**

432.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

433.    APJ Chiro, Abrams, Piazza, and Julewicz knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Chang PC.

434.    The acts of APJ Chiro, Abrams, Piazza, and Julewicz in furtherance of the fraudulent scheme involve referring Insureds to Chang PC and Chang for medically unnecessary services in exchange for unlawful compensation from Chang PC and Chang.

435.    The conduct of APJ Chiro, Abrams, Piazza, and Julewicz was significant and material. The conduct of APJ Chiro, Abrams, Piazza, and Julewicz was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Chang PC and Chang to obtain payment from GEICO and from other insurers.

436.    APJ Chiro, Abrams, Piazza, and Julewicz aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Chang PC for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

437.     The conduct of APJ Chiro, Abrams, Piazza, and Julewicz caused GEICO to pay more than $160,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Chang PC.

438.     APJ Chiro, Abrams, Piazza, and Julewicz's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

439.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTEENTH CAUSE OF ACTION**
**Against Chang PC and Chang**
**(Unjust Enrichment)**

440.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 337 above.

441.     As set forth above, Chang PC and Chang have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

442.     When GEICO paid the bills and charges submitted or caused to be submitted by Chang through Chang PC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

443.     Chang PC and Chang have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

444.     Chang PC and Chang's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

445.     By reason of the above, Chang PC and Chang have been unjustly enriched in an amount to be determined at trial, but in no event less than $160,000.00.

## JURY DEMAND

446.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against APJ Chiro, JKC Pain, and Chang PC, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that APJ Chiro, JKC Pain, and Chang PC have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Abrams, Piazza, and Julewicz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,185,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Abrams, Piazza, Julewicz, Palumbo, Chang PC, and Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,185,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against APJ Chiro, Abrams, Piazza, Palumbo, and Julewicz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,185,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against JKC Pain, Chang PC, and Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,185,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against APJ Chiro, Abrams, Piazza, Palumbo, and Julewicz, more than $1,185,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $290,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against APJ Chiro, Abrams, Piazza, and Julewicz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $290,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against JKC Pain and Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $290,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against APJ Chiro, Abrams, Piazza, and Julewicz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $290,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

K.      On the Eleventh Cause of Action against JKC Pain and Chang, more than $290,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

L.      On the Twelfth Cause of Action against Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $160,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against APJ Chiro, Abrams, Piazza, and Julewicz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $160,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Chang PC and Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $160,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against APJ Chiro, Abrams, Piazza, and Julewicz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $160,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

P.      On the Sixteenth Cause of Action against Chang PC and Chang, more than $160,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: March 13, 2023

RIVKIN RADLER LLP

By:         */s/ Max Gershenoff*
Barry I. Levy, Esq. (BL 2190)
Max Gershenoff, Esq. (MG 4648)
Qasim I. Haq, Esq. (QH 8906)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*